STATE *v.* O. EMERSON CAMP

(No. 6906)

Submitted April 28, 1931. Decided May 12, 1931.
(Rehearing denied June 9, 1931.)

A. M. *Belcher*, for plaintiff in error.

*Howard B. Lee*, Attorney General, *W. Elliott Nefflen*, Assistant Attorney General, and *J. Blackburn Watts*, Prosecuting Attorney, for the State.

WOODS, JUDGE:

O. Emerson Camp complains of the action of the circuit court of Kanawha county in refusing him a writ of error and supersedeas to a judgment of the intermediate court of said

county, sentencing him to confinement in the penitentiary for a term of three years.

The first four counts of the indictment charged the defendant with the larceny of $100.00, $70.00, $500.00 and $92.50, respectively, of the goods and chattels of the board of education of Malden district, etc., and counts 5, 6, 7 and 8 each charged embezzlement of one of said sums, in the order named. At the time of his indictment, Camp was county superintendent of schools for Kanawha county and by virtue of said office, county financial secretary. While evidence was introduced concerning each of the several items with which defendant was charged, the state, at the end of the trial, by an instruction, elected to rely upon the offense charged in the third count, i. e. the larceny of the $500.00 item. In support of this phase of the case, C. L. Skyles, testified that, while secretary of the board of education of Malden district, he informed Camp that $1,100.00 was needed to pay off certain men working for Malden district; that Camp directed him to make out a check for $1,600.00, as he (Camp) needed some money; that he drew a check, dated August 25, 1928, in the sum of $1,600.00, payable to P. F. Hanson, a carpenter, who was building the Valley Grove schoolhouse for the board; that the same was signed by himself, as secretary, I. I. Beasley, as president, and by Camp as county financial secretary; that the check was turned over to Joe Martin, who, after having it cashed, returned to Camp's office and gave the money to Skyles, who then and there gave Camp the sum of $500.00; that afterwards, he and Martin went to the Valley Grove schoolhouse and paid the sum of $492.00 to P. F. Hanson, and paid the remainder of the money to the other men working on the schoolhouse. This witness also testified that Camp had him and Keeney sign a financial statement of the board of Malden district which statement would apparently have absolved Camp. Keeney stated that he signed but did not read the same. Hanson testified that he authorized Skyles to endorse his name on a check for $492.00, but not for $1,600.00. Beasley left several blank checks with his signature as president at Camp's office. J. E. Martin states that he was work-

ing for Camp, but didn't know what Camp wanted to do with the money.

In addition to the particular items set out in the indictment, the State questioned Nellie R. Kern, Camp's secretary, regarding certain checks from various boards in the county, made payable to her, presumbly for grading examination papers. These several checks were written by the several boards at Camp's request. After being cashed by Miss Kern, the money was in each instance turned over to Camp. This testimony was limited by the court to show method, system and intent, and guilty knowledge.

Evidence was introduced on behalf of the defendant denying the several charges of misappropriation. And, when questioned on direct examination regarding the correctness of the testimony of Walter H. Keeney, a witness for the State, to the effect that he had been told (in September, 1929) by Camp that the latter had to put up $2,500.00, and that he thought that Mr. Beasley, Mr. Martin and Mr. Skyles should put up the other $500.00, the defendant admitted that he raised or caused to be placed in the hands of a party $1,500.00 toward the refund to the sheriff, and went into detail as to his reasons for such action on his part.

Complaint is made of the trial court's action in admitting evidence of other offenses of like character. Generally, it is error to admit evidence independent of the crime charged of other offenses, or the prior conviction for other offenses. But there are many exceptions to this rule. In our recent case of *State* v. *Rush*, 108 W. Va. 254, the rule is laid down that upon a charge of embezzlement, other acts of similar character by the accused so intimately connected with the one under investigation as to indicate a general criminal design or system, are admissible. A like rule would apply upon a charge of larceny. 16 C. J., p. 603, sec. 1170. On looking to the evidence of such other offenses admitted in this trial, we find that the trial court limited them to the system and intent of the defendant, and overruled the objection to this testimony, solely for that purpose.

Since the defendant admitted making a $1,500.00 refund to the authorities for part of the sum alleged to have been

filched from the people in Malden district, he does not complain of such admission, but confines his objection to its evidential value against him. The general rule is laid down in the text books that such evidence is admissible where the accused is charged with larceny, as here. 36 C. J. 893. When persons accused of larceny voluntarily pay the value of stolen goods and the costs of prosecution, their conduct is evidence of their guilt. *State* v. *Furr,* 121 N. C. 606. If such act would not weigh against the prisoner, why would attorney Salisbury in making the refund ask that the donor's name be not revealed? In cases involving larceny such evidence is valuable as showing the conduct of the accused immediately after the larceny which has a legal tendency to connect him with the crime.

The panel of twelve selected to sit on the case were sworn before the noon intermission on Monday. On assembling in the afternoon, and before any evidence had been offered, attorney Salisbury for the defendant moved the court to discharge the panel on account of an alleged disqualification of jurors John Snyder and A. F. Vorholt, stating that he had been informed, and would prove, if given time to produce the witness, that said jurors had expressed an opinion in regard to defendant's guilt in a conversation with one John D. Kennedy of Clendenin. Such matters of course may be raised on motion for new trial, and, inasmuch as a question going to alleged improper conduct of a juror should be called to the attention of the trial judge at the earliest moment, to the end that the expense and labor of the trial may be saved if the matter complained of is such as would render the trial abortive, it follows that it was proper to call this matter to the attention of the court before the taking of testimony. But a trial court's action on such matters should not be interfered with unless its discretion has been abused. In the instant case the trial court acted well within its sound discretion in overruling the motion to discharge the panel. Subsequent events justify that action. Although John D. Kennedy was named as the person knowing of the disqualification of the jurors, he was not called as a witness on the motion for a new trial nor was his affidavit taken. No evidence of any

nature was submitted on motion for new trial to substantiate the allegations against Vorholt. After verdict, however, and in support of the motion for a new trial, attacks were made on jurors, John Snyder, Allen Temple, Frank Myers and George Fridley. The remarks attributed to them indicated their individual beliefs prior to the trial of the guilt of the defendant. The general rule is that after a verdict, all presumptions of law are in favor of the jurors' competency, and the burden of proof is upon the one who attacks it. 8 Ency. Ev. 986. The fact that a venireman by reason of something he has read or heard may have entertained an opinion as to the guilt or innocence of the accused is not controlling in determining the qualifications of such venireman to sit as a juror in the trial. The true test is whether without bias or prejudice he can render a verdict solely upon the evidence, under the court's instructions, disregarding any prior opinion which he may have entertained. *State* v. *Dephenbaugh,* 106 W. Va. 289. This matter necessarily must be left largely to the discretion of the trial judge. *State* v. *Porter,* 98 W. Va. 390; *State* v. *Larue,* 98 W. Va. 677. The latter case holds that such discretion cannot, in its very nature, be made a subject of review in this Court, except in a clear case of abuse of that discretion.

Whether or not the evidence is sufficient to sustain the verdict, is another question raised. Counsel for defendant contends that courts will not allow verdicts to stand when they rest upon evidence which is contrary to the physical facts and human experience, and hence incredible. While this indictment contained eight counts, the jury were limited to the consideration of the third count by the only instruction given at the instance of the state. The court had refused to compel the state to elect upon which count it would rely for conviction, but the state in effect by the instruction cited made such election. Thus the whole case was narrowed to a consideration of the order for $1,600.00, and the delivery to the defendant of $500.00 thereof for his own use and benefit, as charged in count three. Skyles' version of this transaction, if believed by the jury, would convict the defendant. His conduct is severely assailed because of his own admitted cul-

pability. Much stress is placed by counsel for the defense in his argument that under Skyles' evidence the whole transaction was consummated on a Saturday, while the evidence of the bank teller, and the stamp on the back of the check, showing payment, was dated three days later. The only instruction refused by the court for the defendant was based upon this apparent discrepancy. Time is not the essence of the offense. The recollections of the parties interested in the transaction may be at variance, but the true inquiry is whether there was such an occurrence, the controlling question being whether the defendant received such money and appropriated it to his own use and benefit. This is the test. Not so much whether or not it was all consummated in one day, but whether the defendant appropriated it to his own use and benefit. On this vital question, the proof is variant. In such cases, the jury are the sole arbiters. The defendant preferred not to ask for an instruction on the theory that he and the prosecuting witness were accomplices. Such instruction, if requested, would doubtless have been given. So, looking at the matter from the standpoint of the state, the jury would have been warranted in believing Skyles although his evidence revealed his own culpability in the transaction. Long ago this Court, following the rules laid down by the Virginia courts, held that a conviction in a criminal case may be had upon the uncorrobrated testimony of an accomplice; and in such case, if the judge who presided at the trial is satisfied with the verdict, and refuses to set it aside, the appellate court will not reverse the judgment and set aside the verdict on the ground that it rested solely on such testimony. *State* v. *Betsall*, 11 W. Va. 703. This holding has been followed by this Court up to the present time.

This leads us to a consideration of the chief ground of error—the insanity of juror Snyder.

The trial in the instant case began on Monday, March 10th, and the verdict returned late Friday afternoon, March 14th. Juror Snyder (age 74 years) rode home with his son, E. W. Snyder, who lived 7 miles out of Charleston on the Clendenin road, where he stayed for the night. He had been accustomed, during his jury service, to go home with this son

each night that he was not locked up on a felony jury. According to the son, his wife, and the wife's father, Snyder was mentally all right that evening. The following morning, when the son started for Charleston, Snyder still seemed normal in every respect. However, about 10:30 he came in from the yard, where he had been playing with his two small grandchildren, and, according to his daughter-in-law, "He put his hand up to his head and said, 'Daughter, there seems to be something wrong up here this morning'." The son returned from Charleston shortly after noon. At that time there was something noticeably wrong with his father. The son and his wife took John Snyder on to his home in Clendenin that afternoon. Snyder grew worse. Dr. C. A. Harper was called in on Sunday. He found Snyder's blood pressure at that time to be 195 over 110. Snyder was later brought to Charleston, and placed in the McMillan Hospital March 26th. He died April 16th.

Was Snyder insane at the time of the trial of the Camp case? The legal presumption is that all men are sane; and the burden of proof is upon him who alleges unsoundness of mind in any individual. Wharton & Stille's Med. Juris., sec. 246. Legal competency to act is the possession of mental capacity sufficient to transact one's business with intelligence, and an intelligent understanding of what he is doing. *Ib.*, sec. 2. The highest court in the land held in the case of *Buchanan, Petitioner*, 158 U. S. 31, that the question in relation to the mental condition of a juror and his competency to return a verdict is a question of fact to be determined by the trial court, which that court upon writ of error to a state court would not review.

Affidavits of Frank Hardman, Mary J. Snyder and W. R. Kennedy, respectively, and oral testimony of Kennedy, J. L. Hanson and H. P. Hammock as to Snyder's actions and statements, shortly prior to the trial; certain affidavits as to Snyder's seeming inattention during Mr. Camp's testimony; the fact that Snyder was admittedly insane at 10:30 Saturday morning; and the testimony of Dr. L. V. Guthrie, a recognized mental expert, then Superintendent of West Virginia State Hospital, Huntington, and Drs. W. A. McMillan, J. R.

Schultz, G. C. Robertson and R. H. Walker, of Charleston, and the affidavit and testimony of Dr. C. A. Harper of Clendenin, were relied upon by defendant to establish Snyder's insanity at the time of the trial.

Affiant Hardman had known Snyder for 17 years. He stated that on March 8th in the city of Clendenin, Snyder took hold of affiant's arm and pushed him about in a very rough manner; that when asked what he was doing, Snyder replied that he was down there running the court; that Judge Black had turned it all over to him, and that he had it all in his hands now; that he was boss of the jurors, and that he had put two of them out by the neck, and that he was now up here looking for some jurymen; that he was getting $15.00 for that work; that the court had been so crooked that they started to clean them up, and that they had found everybody guilty that had come before them and were going to keep it up, if they had to get all new jurymen. Mary J. Snyder, wife, lived with Snyder for 27 years. She stated that Snyder had been absent minded for the past several years; that he had a very sick spell in December, 1929, and was at that time entirely out of his mind and had to be watched like a child; that after he had been serving for some time on the jury, and prior to the trial in the Camp case, he told her that he was getting $5.00 per day for serving on the jury, and the next time he came home he said he was the foreman of the jury and was getting $15.00 per day. Kennedy, a brother to Mrs. Snyder, and who had lived in the Snyder home at Clendenin for the past four years, stated that two or three months prior to the Camp trial Snyder was acting in a very peculiar manner and his conduct was strange and unusual; that this condition continued during the time Snyder was on the petit jury. This affiant was later placed on the stand, and the only particular instance that he pointed out on direct examination to show that Snyder's mind was deranged prior to the trial was certain actions during the sickness in December, 1929. When pressed on cross-examination, he stated that Snyder couldn't keep on a subject very long at a time, and finally, that he couldn't think of anything else "more than his statements about what the court

was using him for and his wages, and so on,'' something theretofore not mentioned by him. Witness Hanson stated that on March 8th Snyder told him one or two things about his jury service which were not exactly true; and Hammock, who operated a confectionery in Clendenin, stated that Snyder would frequent his place of business and would get into a peaceable argument and ''couldn't never finish up without getting mad.''

On the other hand, the State introduced 43 witnesses, which included 25 jurors, six doctors, the sheriff, certain deputies, and a number of other individuals. The jurors, eleven of whom sat on the instant case, all testified that they had noticed nothing in Snyder's speech or actions to cause them to question his mentality, and that, so far as they were able to judge, he was a normal, sane man, and mentally competent to sit on a jury. A number of these jurors related specific conversations had with Snyder during the particular term of court. Several had served with Snyder at the same term on other felony juries in which convictions were had. All the other witnesses who had come in contact with him prior to and during the trial and shortly thereafter likewise state that his actions and speech were in every particular that of a sane man.

The testimony both for the State and the defense is to the effect that Snyder was a very religious man. It also appears that he was very jovial and a great handshaker. As one witness stated, he would usually shake hands with one hand and strike you on the shoulder with the other. He joined with the jurors in their songs, and seemingly made himself agreeable to all.

The theory advanced by counsel for defendant is that Snyder was at the time of the trial suffering from *senile dementia.* However, the testimony of neither Dr. Guthrie nor Dr. McMillan, both of whom were credited with such a diagnosis, will bear such interpretation. Dr. Guthrie, who, prior to testifying on Tuesday, April 8th, had observed Snyder on two Sundays, admitted his inability to diagnose the case, but stated ''perhaps by continued observations for a few weeks I could diagnose it. If it is *senile dementia* that will be

ended when death calls him, which may not be so long."
Dr. McMillan stated at the time of his testimony that Snyder's
insanity was assuming a phase of *senile dementia*. This lat-
ter witness, when called as a witness for the State, in re-
ferring to the daughter-in-law's evidence, stated: "I believe
the old man made his own diagnosis when he felt that some-
thing had gone wrong with him. At that time that was the
beginning of the old man's 'crack' or cerebral spasm, as we
might term it." And in response to a question as to who
diagnoses the average case of insanity significantly said: "The
laity, who notice it and generally notify the doctors." The
medical experts introduced by the defendant only spoke
theoretically of the juror's condition. They all agree that the
sporadic exclamations attributed to Snyder were suspicious
and were indicia of insanity. Dr. Guthrie ventured the
opinion that Snyder because of his physical condition, i.e.,
age, blood pressure, etc., "owed it to himself to stay off the
jury. The mental strain would be one thing that would de-
velop insanity—the hard strain of a trial, and it's hard work
to loaf around a court room."

The jurors who sat with Snyder on the instant case, which
occupied five days and four nights, were necessarily, under
the law, kept together. They as well as the officers in charge
all testify as to Snyder's sanity. The very nature of the
alleged disqualification would naturally render it perceptible
at such a time. The fact that both the defendant and the
State accepted Snyder as a juror is evidence that his exami-
nation and appearance on the *voir dire* had impressed them
favorably.

We could not lay down a rule that Snyder's subsequent
insanity would vacate a verdict returned by him and eleven
others without at least a strong showing that he was insane
at the time of the trial. Giving due weight to all the evidence
offered on the precise question at issue—the mental condition
of the juror at the time of his jury service—can we say that
Snyder was of unsound mind at such time? A verdict will
not be set aside on the ground of insanity of a juror, who
took part in a trial with apparent intelligence in deliber-
ating with his fellows although not long afterward his in-

sanity was indisputable and was of such 'a nature as probably would have existed, to some extent at the trial, medical opinion differing as to whether it would have impaired his power of deliberate judgment as a juror. *Burik* v. *Dundee Woolen Co.*, 66 N. J. L. 420. In the face of the conflict of evidence, and the peculiar weight we must accord to the learned trial judge on his finding, it seems to us to be such a question that is the province of the lower court to decide. We would be doing violence to law and precedent were we to disturb it here.

We find no other questions demanding our consideration and, after the most patient consideration, of the briefs of counsel, and of this large record, and the able arguments made by counsel at the hearing, we are irresistibly led to the conclusion that the defendant had a fair trial, and that we should affirm the judgment.

*Judgment affirmed.*