**John B. SANDERS, Jr., Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 25043.**

United States Court of Appeals
Fifth Circuit.

Aug. 27, 1969.

Rehearing Denied Oct. 28, 1969.

Stanley Jay Bartel, James L Guilmartin, Miami, Fla., for appellant.

E. V. Boagni, Asst. U. S. Atty., Shreveport, La., Marvin R. Loewy, Special Atty., Dept. of Justice, Washington, D. C., Edward L. Shaheen, U. S. Atty., Arthur F. Mathews, Howard S. Jacobs, Attorneys, United States Securities and Exchange Commission, Washington, D. C., of counsel, for appellee.

Before GEWIN and BELL, Circuit Judges, and BOOTLE, District Judge.

BOOTLE, District Judge:

John B. Sanders, Jr., appeals from his conviction under 15 U.S.C.A. § 77q(a) (the use of any means or instruments of transporation or communication in interstate commerce, or use of mails, in furtherance of a scheme to defraud in

the sale of securities), 18 U.S.C.A. § 1341 (use of mails in furtherance of a scheme to defraud), and 18 U.S.C.A. § 371 (conspiracy to commit the two above mentioned offenses). He presents eight issues for review. After careful consideration we find all these issues without merit. We affirm.

We shall state and consider these eight issues seriatim.

*Key Man System*

Appellant asserts that the jury selection process was illegal and that the court clerk and the jury commissioner used the so-called "Key Man" system. In support of this contention he proved in the court below that indeed the "Key Man" system was used; that the clerk and commissioner had contacted in excess of 75 people in the six parishes comprising the court division asking them to submit lists of prospective jurors, required each prospective juror to complete a questionnaire, excused all persons entitled to a statutory excuse plus doctors, lawyers, nurses, school teachers and ministers pursuant to local court rules, and had placed in the venire box the names of those remaining deemed qualified. No evidence was adduced or showing made with respect to the composition of the jury box, or of the grand jury or petit jury venire from which the jurors were drawn or to be drawn for appellant's trial. No showing was made that any racial, social, economic or other class of group was excluded systematically or otherwise either intentionally or nonintentionally. Nor was it shown that the jury selectors used wrong standards or inadequate sources. Appellant apparently proceeds on the theory that the "Key Man" system is illegal "per se". We do not perceive that to be the law. See Mobley v. United States, 379 F.2d 768, 773 (5th Cir. 1967).[1] Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940) relied upon by appellant is inapposite. In that case there was an inten-

tional and systematic exclusion of Negroes from jury service because of race.

*Duplicity*

■ Appellant's contention that there was duplicity in the conspiracy count, that this count charged, and that the evidence proved, two conspiracies, is without substance. The indictment is in twenty-five counts. Counts 1 through 12 charge securities violations, Counts 13 through 24 charge mail fraud violations, and Count 25 charges a conspiracy to commit the two just mentioned offenses. The first seventeen paragraphs of Count 1, which are by reference made common to all of the twenty-four substantive counts and to the conspiracy count, Count 25, as well, allege in great detail and specificity a single plan or scheme to defraud the alleged victims. Thus all counts including the conspiracy count allege that this scheme lasted and continued ·from on or about November 22, 1957 until on or about March 15, 1965. The indictment named Sanders and six other defendants describing them generally as follows: Sanders as the promoter, organizer and controlling figure in a group of corporations referred to generally as the Underwriter's group; Charles A. Landry as vice-president or other officer or director in many of these corporations and having charge of their records and assisting Sanders in their management and direction; Thomas M. Moss, Jr., a Certified Public Accountant doing the accounting work for these companies; Irwin L. Gitz and Ellis S. Joubert, Jr., owners of Gitz & Joubert Associates, Inc., which offered, sold and distributed some of the securities involved; and Stephen J. Dinneen and Joseph Ryan Missett, Managing Director and Chairman of the Board respectively, and controlling stock holders of Lords Bank and Trust Company Limited, a Bahamian corporation, with its statutory office in Nassau, Bahamas, but operating out of Miami, Florida. The scheme alleged in brief was that the defendants would through misrepresentations of various sorts defraud the public by selling worthless securities of these corporations. Significantly paragraph 13 of the scheme alleged in Count 1 charged in effect that for the purpose of avoiding detection. of the scheme to defraud, of allaying fear of losses by investors from securities sold, of obtaining additional funds from investors, of concealing from investors the insolvency of the Underwriters Group corporations, and of lulling investors into a false sense of security, certificates of deposit of Lords Bank and Trust Company were obtained by Sanders from Dinneen and Missett and were offered and sold to investors partly for cash and partly in exchange for worthless securities already sold to such investors. All seven defendants are charged in all twenty-five counts except that Dinneen and Missett are charged in only substantive counts 1, 2, 3, 13, 14, and 15 and in the conspiracy count. The dates alleged in these substantive counts run from September 25, 1962, to June 4, 1964, whereas the earliest substantive offense charged against Dinneen and Missett is February 17, 1964, Count XV. And whereas the thirty overt acts alleged range from May 19, 1959 to June 2, 1964, the earliest overt acts charged against Missett and Dinneen is January 15, 1964, Overt Act 24. Thus it is apparent from these dates and from paragraph 13 of Count I above mentioned

---

1. "Though we held in *Rabinowitz v. United States*, 5 Cir. 1966, 366 F.2d 34, that the 'key man' system of juror selection, coupled with an impermissible departure from the federal statutory scheme, produced a 'poisoned' basic jury list, and that 'the fruits of that list were also infected' (Id. at 60), we did not thus declare the 'key man' selection system illegal as such. See *Scales v. United States*, 367 U.S. 203, 259, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). We felt that the facts in *Rabinowitz* warranted a holding that the jury list was improperly constituted because the jury selectors applied 'wrong standards' and used 'grossly inadequate sources.' "

that Missett and Dinneen representing this alleged offshore bank are alleged late comers into the conspiracy. Because of this belated entry or appearance upon the scene of Missett and Dinneen, Sanders attacked the conspiracy count prior to trial as alleging two conspiracies rather than one and therefore as being duplicitous. Apparently he contended in the court below also and for the same reason that the substantive counts charge two schemes to defraud, one by selling securities of the Underwriters Group and another by selling the certificates of deposit of the offshore bank. Without stopping to inquire whether there could be any valid objection to trying this sole defendant Sanders, by himself, for as many separate schemes as the grand jury saw fit to charge him with we fully agree with the trial court that the indictment alleges only a single plan or scheme to defraud the alleged victims, that according to the indictment Missett and Dinneen joining the group late became participants in the original scheme and added a new commodity to sell, the certificates of deposit of Lords Bank. We agree with the trial court also that the indictment in Count 25 charged only one conspiracy. See United States v. Sanders, 266 F.Supp. 615 (W.D.La.1967). The trial court correctly ruled on the pre-trial contentions and now the record shows that under the evidence the jury was abundantly authorized to find that there was only one scheme and one conspiracy. See Baker v. United States, 156 F.2d 386 (5th Cir. 1946). Moreover, if there had been more than one scheme or conspiracy proved at the trial Sanders could not complain. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) does not reach this case. It holds that it is unfair to indict and try as one conspiracy as many as eight separate and distinct conspiracies where the defendants on trial are not connected in any way as among themselves, though all of them are connected and connected only with a central figure who had pleaded guilty and is not on trial. The central figure in that case was not Kotteakos or any of his codefendants on trial but was one Simon Brown. In the case at bar Sanders was the only defendant on trial, severances having been granted to all others, and the jury was fully justified in finding that there was only one scheme and only one conspiracy and he was the central figure in it. Even if the jury had concluded that there were two schemes and two conspiracies as Sanders contends unquestionably under the evidence he was the central figure in each. He was not harmed or prejudiced in any manner. It is not contended that he was surprised at all and the plea of former conviction is available to him should he ever be again prosecuted for any matters alleged in this indictment. Berger v. United States, 295 U.S. 78, 83, 79 L.Ed. 1314, 1318. This court has stated in Jolley v. United States, 232 F.2d 83, 88 (5th Cir. 1956) and repeated in Parmenter v. United States, 279 F.2d 151 (5th Cir. 1960):

> "Under the evidence in this case, we think that it was for the jury to say whether there was any conspiracy and if so, whether one or more than one. If more than one conspiracy was proved, of at least one of which the appellant was guilty, it is clear that there was no variance affecting his substantial rights."

### Re-indictment of Codefendants

We reject out of hand Sanders' contention that the Government is now estopped to deny duplicity in this case by reason of the fact that after his conviction the grand jury re-indicted Missett and Dinneen on a "pared down" version of the conspiracy so as to charge the Nassau conspiracy alone and then dismissed or dropped insofar as those two defendants are concerned the charges in the indictment under which Sanders was convicted. Incidentally, the briefs state that Missett and Dinneen were convicted under the superseding indictment. That procedure was doubtless fair to Missett and Dinneen as was the granting to them of a severance from Sanders. But Sanders can claim no benefit therefrom. Unto each that to which he is due.

### Successive Sentences

We consider now appellant's contention that it was error to sentence him to successive sentences on counts involving essentially the same evidence. He was convicted on all counts except counts four and nineteen which were abandoned by the Government. Thus he was convicted on eleven securities fraud counts, eleven mail fraud counts and on the conspiracy count. On each of the eleven securities fraud counts he was sentenced to five years imprisonment, these eleven sentences to run concurrently with one another. On each of the eleven mail fraud counts he was likewise sentenced to five years imprisonment, these eleven separate sentences to run concurrently as among themselves but consecutively to the five year term imposed on the securities fraud counts. And on the conspiracy count he was sentenced to five years imprisonment to run concurrently with the five year terms imposed on the mail fraud counts but consecutively to the five year terms imposed on the securities fraud convictions. Thus he was sentenced to serve a total of ten years upon conviction for twenty three crimes for which, if they are separate crimes, he could have received maximum consecutive sentences totaling one hundred and fifteen years. Appellant argues that all these counts, the securities fraud, the mail fraud, and the conspiracy, in essence allege but one crime and that the maximum sentence that could be imposed would be one five year sentence.

It is settled that each separate use of the mails in the execution of a scheme to defraud constitutes a separate offense. Badders v. United States, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706 (1916); Mitchell v. United States, 142 F.2d 480 (10th Cir. 1944). And it has long been settled that consecutive sentences may be imposed for the violation of a criminal statute and for conspiracy to violate it. See Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) and Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). If the conspiracy sentence had been made to run consecutively to the mail fraud sentences (and concurrently with the securities fraud sentences) rather than consecutively to the securities fraud sentences we might or might not have a question. See Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 [June 23, 1969]. But as it is we inquire whether the securities fraud counts allege crimes separate and distinct from both those alleged in the mail fraud counts and that alleged in the conspiracy count. Each of these securities fraud counts refers to a separate offer and sale of the securities described therein to certain named individuals and alleges one specific use of the mails or instrumentality of commerce thus setting forth a separate and complete fraudulent transaction. Though some distinct courts have held to the contrary, see United States v. Hughes, 195 F.Supp. 795 (S.D.N.Y.1961) and United States v. Greenberg, 30 F.R.D. 164 (S.D.N.Y.1962) and though United States v. Cashin, 281 F.2d 669 (2d Cir. 1960) looks somewhat to the contrary while primarily construing Rule 21 (b), Fed.Rules Crim.Proc. and the general venue provisions for continuing offenses, 18 U.S.C.A. § 3237(a), we agree with the court below that the proper construction of 15 U.S.C.A. § 77q(a) is that each fraudulent offer or sale of any security accompanied by mailing or use of any means or instruments of transportation or communication in interstate commerce is a separate crime. See United States v. Sanders, 266 F.Supp. 615, 619 (W.D.La.1967). See also Palmer v. United States, 229 F.2d 861, 867 (10th Cir. 1955) cert. den. 350 U.S. 996, 76 S.Ct. 546, 100 L.Ed. 861 (1956); Holmes v. United States, 134 F.2d 125, 135 (8th Cir. 1943); United States v. Binstock, 37 F.R.D. 13 (S.D.N.Y.1965); United States v. Brown, 36 F.R.D. 207 (D.C. 1964). Cf. United States v. Crosby, 314 F.2d 654 (2d Cir. 1963) upholding consecutive sentences for conspiracy to violate 15 U.S.C.A. § 77e(a) and for a substantive mail fraud violation, and Vickers v. United States, 157 F.2d 285 (8th Cir. 1946) sustaining consecutive sen-

tences for conspiracy to devise a scheme to defraud and to use the mails in execution of the scheme and for substantive offense of mail fraud through use of the mails.

### Failure to Suppress Evidence

It is appellant's contention that the court erred in failing to suppress all books and records of Sanders and Company, his sole proprietorship, as distinguished from the books and records of the various corporations. It is dispositive of this contention to say that on the extended pre-trial hearing of appellant's motion to suppress he failed to prove that any of the Government investigators ever saw or examined any books or records of Sanders and Company or in any manner derived any information from them and that at the trial none of such books or records was tendered in evidence or used against appellant. Nor does it appear that even if it had been established that there was a poisoned tree in this respect that any of its fruits were used against appellant. Then too, the trial court found as a fact from the evidence adduced at the hearing of the motion to suppress, and the evidence fully authorized the finding, that with only one exception hereinafter mentioned all of the books and records examined by the Government investigators were freely and voluntarily turned over to them, first by accountant and codefendant Moss at the latter's office in Houston when they appeared at his office following a letter from an attorney for the Underwriters Group Written to the Regional Office of the Securities and Exchange Commission; that Mr. Moss turned over such books and papers voluntarily there being no trickery or stealth employed; that then accompanied by Mr. Moss the investigators proceeded to appellant's Lake Charles office used jointly by the various corporations, where additional books and records were voluntarily produced by Mr. Landry, appellant's codefendant and office manager. The trial court further found as was fully authorized by the evidence including the testimony of Landry and the appellant that appellant had previously instructed Landry to cooperate with the investigators and to give them access to all of his books and records and the books and records of all the corporations. Subsequently, when the preliminary examinations so conducted showed the possibility of violations of the Securities Act the investigators specifically informed Landry of his rights and warned him that what he might say might be used against him. Thereafter, three subpoenas were issued calling only for corporate records and no records are shown to have been delivered other than those called for by the subpoenas. There was no protest or refusal to produce pursuant to the subpoenas and there was no claim of the privilege against self incrimination advanced by Mr. Landry or by anyone else acting for appellant or any of the codefendants, as authorized by 15 U.S.C.A. § 77v(c). The corporate books and records thus produced under these subpoenas constituted the only exception to the free and voluntary production above mentioned. Thus the trial court was fully justified in overruling the motion to suppress.

### Failure to Grant Continuance

The indictment was returned on April 28, 1966. Appellant was arraigned on August 19, 1966 with the aid of counsel appointed for arraignment only, appellant then refusing to accept court appointed counsel for trial advising the court that he desired to retain his own trial counsel. On August 23, 1966, however, appellant by affidavit applied for court appointed counsel and the court appointed two attorneys to represent him. On October 11, 1966, appointed counsel filed a motion to withdraw on the ground that appellant had suficient funds to employ counsel. At a hearing held on December 2, 1966, the court denied counsel's request for withdrawal, granted certain motions for discovery, inspection and bills of particulars to other defendants and extended the benefit of such motions to appellant and granted counsel for appellant until January 3, 1967 to file additional motions on behalf of appellant.

Also on December 2, 1966, the court announced that the case would be set down for trial on the merits during the month of February, 1967. At that time the tentative trial date was February 7, 1967. Thereafter the court appointed counsel filed various motions on appellant's behalf. Some of the relief requested was granted and some denied. See United States v. Sanders, 266 F.Supp. 615 (W.D.La.1967).

On February 6, 1967, Mr. Gill, who later became trial counsel, was consulted by appellant in connection with being retained. On February 13, 1967, Mr. Gill informed the court that he was probably entering the case. Prior to February 15, 1967, Mr. Gill had conferred with court appointed counsel twice some thirty minutes to an hour each time. In the meantime the court had postponed the trial first to February 20, and thereafter to March 6, 1967. On February 15 and 20, 1967, Mr. Gill filed additional motions for appellant including motions to suppress evidence, to obtain further particulars, to dismiss the indictment, for a continuance, to quash the jury venire, and to obtain subpoenas for defense witnesses. The motion for continuance was heard and overruled on February 20, 1967. Some of the other motions were also heard on February 20, and thereafter an evidentiary hearing was held on February 28, 1967, after which the motions to suppress and to quash the jury venire were denied. In denying the motion for a further continuance beyond March 6, 1967, the trial court was aware that Mr. Gill had had local prosecutory experience as an Assistant District Attorney in a State Court and that Mr. Gill had represented appellant previously in a bankruptcy action in August, 1965, and pointed out to Mr. Gill that the court had ordered the Government to accord appellant substantial pre-trial discovery by filing with the court copies of all documents which the Government expected to introduce into evidence.

At the trial which began on March 6, 1967, appellant was actively represented not only by Mr. Gill but also by another attorney, Mr. Emile Carmouche, who was formally enrolled as counsel for appellant immediately after the noon recess on the second day of the trial and he began his active participation in the trial at that time. Mr. Carmouche had entered the case on behalf of codefendants Dinneen and Missett on January 27, 1967 and had attended a pre-trial conference and had been instructed by the court to prepare for the trial of his clients scheduled to begin on ten days notice after completion of appellant's trial. Thus Mr. Carmouche already had some familiarity with the case having been in it on behalf of codefendants from January 27, 1967 until the trial date, March 6, 1967, and Mr. Gill had some familiarity with the case by reason of having represented appellant in bankruptcy proceedings arising from the transactions which are the basis for the indictment in the instant case.

A reading of the lengthy record and the trial transcript in this case leaves no doubt that appellant was capably represented at his trial. We conclude that the trial court did not abuse his discretion in refusing the motion for continuance. Galbraith v. United States, 387 F.2d 617 (10th Cir. 1968); Leino v. United States, 338 F.2d 154 (10th Cir. 1964); Lemons v. United States, 337 F.2d 619 (9th Cir. 1964); Lewis v. United States, 277 F.2d 378 (10th Cir. 1960); Bryant v. United States, 252 F.2d 746 (5th Cir. 1958); Brown v. United States, 228 F.2d 286 (5th Cir. 1956); Davenport v. United States, 197 F.2d 157 (5th Cir. 1952); McHale v. United States, 398 F.2d 757 (D.C. Cir. 1968).

*Admission of Evidence and Sufficiency of Evidence as to Values*

■ Appellant contends that it was error to permit the Trustee in bankruptcy to testify as to the amount realized through sale of the assets of appellant's corporations when the value of said assets lay at the heart of this case. Here we need not tarry long. The al-

leged conspiracy dated from November 22, 1957 to March 15, 1965. The trustee was appointed November 30, 1964 and embarked upon his duty of marshalling the assets of three bankrupt corporations. He conferred with appellant and got from him all information possible concerning these assets. He sold the bankrupt corporations' equity in the mining properties in August, 1965 and sold some stocks in January, 1966. Certainly the amounts he was able to realize from these sales comes within the range of relevant and legally competent evidence particularly when accompanied as here by a special instruction that the amounts so realized were only a circumstance which the jury could consider in finding as they must the value of the properties at the dates and during the time alleged in the indictment. Neubauer v. United States, 250 F.2d 838 (8th Cir. 1958). Cf. Sparks v. United States, 241 F. 777, 792 (6th Cir. 1917). The cases cited by appellant, United States v. Tellier, 255 F.2d 441 (2d Cir. 1958); McHale v. United States, 130 U.S.App.D.C. 163, 398 F.2d 757 (1968), and Reining v. United States, 167 F.2d 362 (5th Cir. 1948) are clearly distinguishable.

■ The further contention is advanced that there was no proper evidence of the asset value of Lords Bank and Trust Company. We do not agree. We think the evidence overwhelmingly establishes the practical worthlessness of the certificates of deposit. In fact appellant announced at a conference on October 30, 1964 that he had heard various ways, this, that and the other, and that he did not have any faith in their being paid and that he had made up his mind that they were not going to be paid.

### The Allen Charge

■ The jury began its deliberations at 4:45 P.M., after the court had concluded its charge by instructing the jury not to reveal to anyone how the jury stood at any time during their deliberations. The jury thereafter sent a few notes to the court. Note number 1 requested instructions "in writing" on three points necessary to be proved. With consent of counsel, the court wrote back: "I cannot give this to you in writing, but if necessary, I will call you back into court and read the essential elements of each offense to you again." There was no further reply from the jury with respect to that matter. Notes numbers 2, 3 and 4 requested certain exhibits which were supplied. Shortly prior to 6:55 P.M. the jury sent note number 5, reading: "We have reached a point where the jury votes 11 members guilty 1 member not guilty on all counts of the indictment. Please instruct in the proper procedure." Thereupon the court advised counsel out of the presence of the jury as follows: "I am not going to read this note verbatim. The substance of it is, the foreman says they have reached a point where they are not in agreement on all counts of the indictment, and he says 'please instruct us in the proper procedure.'" After conferring further with counsel the court called the jury in at 7:00 P.M. and said to them: "In regard to the last communication which I received from the jury, the contents of which have not been completely disclosed to the attorneys or to the audience, but which I have stated, informs the court that the jury at this point is unable to reach an agreement, unanimous agreement on any count of the indictment, and you request further instructions. Is that a fair statement of your communication. Mr. Hardee (foreman)?" The foreman replied: "Yes, Your Honor." Then the court proceeded to recharge the jury at their request with respect to the three points inquired about by them in their note number 1. In so doing, he stated to them again: "How the jury stands is not to be disclosed during your deliberations." The jury then retired again at 7:15 P.M. Then, calling counsel to the bench, the court advised them as follows: "The last communication from the jury indicated to the court that the jury was split and gave the number of jurors on the side of guilty and the side of not guilty, which I did not want to disclose, and don't think it is proper to disclose at this time. I'm going to have

the Clerk file it—it will be filed—and it will be sealed and will be available to all of you after the trial." Then shortly before 9:50 P.M. the court received another note as follows: "Your Honor, the twelve members all agree that the

jury is hopelessly deadlocked. The position remains as it was in my last note."

Then at 9:50 P.M. the court gave a modified version of the *Allen* charge footnoted below.[2]

2. "Members of the jury, the Court has received another communication from your foreman which reads, 'Your Honor, the twelve members all agree that the jury is hopelessly deadlocked. The position remains as it was in my last note. Signed H. G. Hardee, Jr., Foreman.'

"Now, this is not an unusual situation, especially after such a long case and after such a long day. I know that all of you, at this time, are tired and it might be advisable at this point to recess the jury and permit the jurors to return home, and return in the morning to reconsider and again resume your deliberations.

"However, I thought that before doing that, I would suggest a few additional thoughts which you might desire to consider in your deliberations, along with all the evidence and all the instructions previously given.

"As you know, this is an important case, the trial has been expensive both to the prosecution and to the defense. If you fail to agree on a verdict, the case is left open and undecided. Like all cases, it has to be disposed of sooner or later. There does not appear to be any reason to believe that another trial would not be equally expensive to both sides. Nor does there appear to be any reason to believe that the case can be tried again better, or more exhaustively, than it has been before you on either side. Any future jury must be selected in the same manner and from the same sources as you have been chosen. So there appears no reason to believe that the case would ever be submitted to twelve men and women more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence could be produced on behalf of either side.

"Of course, these matters suggest themselves, upon brief reflection, to all of us who have sat through this trial. The only reason they are mentioned is because some of them may have escaped your attention which must have been fully occupied up to this time in reviewing the evidence. They are matters which, along with other and perhaps more obvious ones, remind us how important and desirable it is that you unanimously agree upon a verdict of guilty or not guilty, if you can do so without violence to your individual judgment and conscious (sic).

"It is unnecessary to add, members of

the jury, that this court does not wish any juror to surrender his or her conscientious convictions. As stated in the instructions given at the time the case was submitted to you, do not surrender your honest convictions as to the weight or affect of evidence solely because of the opinion of the other jurors, or for the mere purpose of returning a verdict.

"However, I wish to repeat that it is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each one of you must decide the case for yourself, but you should do this only after a consideration of the evidence with your fellow jurors. And in the course of your deliberations, you should not hesitate to change your opinion, when convinced it is erroneous. In order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor and frankness and with proper deference to, and regard for, the opinions of each other. That is to say, in conferring together, each of you should pay due attention and respect to the views of the others and listen to each other's arguments with a disposition to reexamine your own views. If much the greater number of you are for a conviction, each dissenting juror ought to consider whether a doubt in his or her mind is a reasonable one, since it makes no effective impression upon the minds of so many equally honest, equally intelligent fellow jurors who bear the same responsibility, serve under the sanction of the same oath, and have heard the same evidence with, we may assume, the same attention and equal desire to arrive at the truth.

"On the other hand, if a majority, or even a lesser number of you, are for acquittal, other jurors ought seriously to ask themselves, again, whether they do not have reason to doubt the correctness of a judgment which is not concurred in by many of their fellow jurors, and whether they should not discuss the weight or sufficiency of the evidence which fails to convince the minds of several of their fellows to a moral certainty and beyond a reasonable doubt.

"You should also remember this instruction which I gave you previously under the law. You are not partisans, you

Significantly, appellant's counsel took no exception to the giving of either of these supplemental charges, though at the conclusion of the *Allen* charge the court said: "Is there anything gentlemen, before we recess again?" Attorney for the Government replied, "Nothing for the Government, Your Honor," and counsel for appellant replied, "Nothing for the defendant, Your Honor." Of course, counsel then knew that the court knew how the jury stood and still no exception was noted to the *Allen* charge. Appellant now contends that the giving of the *Allen* charge was error particularly since the court then knew that the jury stood eleven for conviction and one for acquittal. As this court said in Thaggard v. United States, 354 F.2d 735, at 739 (5th Cir. 1966), the *Allen* charge "so long as it makes plain to the jury that each member of the jury has a duty conscientiously to adhere to his own honest opinion and avoids creating the impression that there is anything improper, questionable, or contrary to good conscience for a juror to cause a mistrial * * * is still a permissible charge to be given in proper circum-

stances in this Circuit." The charge here complained of cannot be faulted as to any of these criteria. In fact the complaint sometimes leveled at the *Allen* charge, namely, that it contains no admonition that the majority re-examine its position, see United States v. Fioravanti, 3d Cir. 1969, 412 F.2d 407 [June 16, 1969], does not apply here because the trial court knowing how the jury stood varied the orthodox charge so that one sentence reads as follows: "On the other hand, if a majority, *or even a lesser number of you,* are for acquittal, *other jurors* ought seriously to ask themselves, again, whether they do not have reason to doubt the correctness of a judgment which is not concurred in by many of their fellow jurors, and whether they should not discuss the weight or sufficiency of the evidence which fails to convince the minds of several of their fellows to a moral certainty and beyond a reasonable dobut." (Emphasis supplied.)

The fact that the jury contrary to the instructions of the court volunteered to the court the extent of their division and

are judges, you are judges of the facts. Your sole purpose is to ascertain the truth from the evidence before you. You are the sole and exclusive judges of the credibility of all the witnesses and of the weight and effect of all the evidence. In the performance of this high duty, you are at liberty to disregard all comments of both Court and counsel, including, of course, the remarks that I am now making. Remember at all times that no juror is expected to yield a conscientious conviction she or he may have as to the weight of [sic] effect of evidence. But remember also, that after full deliberation and consideration of all the evidence, it is your duty to agree upon a verdict, if you can do so without violating your individual judgment or your conscience.

"You may conduct your deliberations as you choose, but I suggest that you now retire and carefully re-examine and reconsider all of the evidence bearing upon the questions before you. You may take as much time in your deliberations as the occasion shall require, and you shall take all the time which you may fell necessary. The Marshals have been instructed to advise me when you inform them that you are ready to retire, and the Court will recess the jury and permit you to go

home and return tomorrow morning to continue your deliberations.

"I also wish to again caution the jury and to remind them that as a matter of law, a verdict should not be based upon sympathy for the accused or prejudice against him, nor should it be governed by public opinion. You must judge this case on the base of the evidence and exclude considerations of sympathy. You are also not to consider, members of the jury, the effect of any verdict, whether it be guilty or not guilty. The punishment, if the verdict is guilty, is left entirely to the Court, and the effect of a verdict of acquittal is what the public expects that a jury has performed its duty according to its oath, impartially in fairness to both sides, and that's all that the public expects.

"You may retire to your jury-room, and I will ask you to continue your deliberations in such manner as shall be determined by your good and conscientious judgment as reasonable men and women. If you become tired and feel that we should retire, I would suggest that you let the Marshal know and as I say, we will recess the case and you may continue your deliberations tomorrow morning."

which way they stood is no reason why the court should be precluded from giving an otherwise proper *Allen* charge. Cf. United States v. Rao, 394 F.2d 354, 355, 356 (3d Cir. 1968).

Affirmed.