**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Samuel COHEN, Defendant-Appellant.**

**No. 1015, Docket 71-1304.**

United States Court of Appeals,
Second Circuit.

Argued July 13, 1971.

Decided Oct. 1, 1971.

Harvey M. Silets, Chicago, Ill. (Harris, Burman & Silets, Chicago, Ill., Theodore A. Sinars, Chicago, Ill. of counsel), for defendant-appellant.

John H. Doyle III, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, Jack Kaplan, Asst. U.S. Atty., of counsel), for plaintiff-appellee.

Before FRIENDLY, Chief Judge, and LUMBARD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

The appellant, Samuel Cohen, appeals from a judgment of conviction entered by Judge Mansfield, sitting without a jury. Conviction was on Counts Two through Fifteen of a fifteen count indictment, charging in Count One essentially a conspiracy to defraud the Commodity Exchange Commission (hereinafter the "Commission") and to violate 7 U.S.C. § 6a by exceeding Commission trading limits; charging defendants in Counts Two through Twelve with eleven specific instances of trading in potato futures in excess of 150 carlots, the Commission's trading limit; and charging defendants in Counts Thirteen through Fifteen with selling and buying in excess of the one-day limit for trading in potato futures, also 150 carlots. Appellant's co-defendants, his two sons and a business associate, were acquitted on all counts, as was appellant on the conspiracy count. Appellant argues that there was insufficient evidence on which to convict him on any count, that the acquittal of the other defendants precludes his conviction, and that the imposition of a fine of ten thousand dollars on each of Counts Two through Twelve, or a total of $110,000, was improper under the statute.

Trading in potato futures is done on the New York Mercantile Exchange in 50,000 pound units, i. e., carlots, and involves entering into contracts to buy or sell these units at a particular future time, here May 1966. Trading in May 1966 potatoes began in June 1965 and ended on May 10, 1966. Appellant's trading, done through F. J. Reardon, Inc., a futures broker or commission merchant, commenced on September 29, 1965, and consisted primarily of contracting to sell May 1966 potatoes and, as is almost universally done in futures trading, liquidating the consequent "short" position by purchases prior to the May 11, 1966, deadline for delivery.

Trading in potato futures, as for other commodities, is limited by statute and by the regulations issued by the Commission. The statute here requires the

Commission to fix a trading limit and makes it unlawful "directly or indirectly" to buy, sell or agree to buy or sell any amount of a regulated commodity "during any one business day in excess of any trading limit fixed for one business day by the commission," 7 U.S.C. § 6a(2) (A), or any amount of such commodity "that shall result in giving such person a net long or net short position at any one time * * * in excess of any trading limit fixed by the commission * * *" 7 U.S.C. § 6a(2) (B). The Commission regulations in effect for appellant's trading fix the "limit on the maximum net long or net short position which any person may hold or control" on the May potato futures at 150 carlots, 17 C.F.R. § 150.10(a) (3), and the "limit on the maximum amount of potatoes which any person may buy * * * [or] sell * * * during any one business day" as 150 carlots, 17 C.F.R. § 150.10(b) (3). Appellant does not dispute the trial court's finding that he had knowledge of the trading limits. Rather, he claims that the trading in May 1966 potato futures done by his two sons and his business associate cannot be treated as trading by him so as to constitute "indirect" trading in violation of the statute. Thus he claims not to have exceeded the Commission's limits for one person's daily trading or for a maximum net long or short position which any person may hold or control, in violation of the Commission regulations.

Our examination of the record convinces us that there was ample evidence to support the trial court's finding that, in order to evade the Commission's limits for trading, appellant used his co-defendants and their accounts with F. J. Reardon, Inc. The Government's evidence, through employees of the broker, was that appellant himself placed the orders not only for his own account but also for the accounts of his two sons and his business associate. These employees, despite trading by the co-defendants on numerous occasions in substantial amounts in December 1965 and the first five months of 1966, at best "vaguely" recalled talking to these co-defendants; the order tickets for them usually bore the letter "S" or "SC" or the name "Sam" or "Sam Cohen," indicating to the employees that the orders were in fact for appellant's account.

More importantly, the pattern of trading clearly revealed that the trades executed in the co-defendants' names were for appellant's purposes. At the very moment appellant reached his 150 carlot limit, on December 9, 1965, trading in his son Joel's account commenced. Similarly, trading in the account of his business associate, Blacker, did not commence until January 17, 1966, when the accounts of appellant and his son Alan were already at the 150 carlot limit and the very day that the account of appellant's son Joel reached its limit. The facts that from September 29, 1965, until October 21, 1965, there was a relatively small short position in Alan Cohen's account, and that there was some trading by appellant in *April* as opposed to May futures, and that in April 1966 appellant was under his trading limit while trades were being made in the others' accounts, go only to the weight of the evidence. Individually or collectively these facts do not negate the inferences drawn by the lower court from appellant's pattern of trading. That pattern, we believe, supports the conclusion that appellant's aim was to evade the Commission's trading limits.

In addition, the futures broker sent order confirmations to appellant's sons in care of appellant at his Miami hotel; appellant signed the names of his sons and business associate on letters addressed to the broker authorizing it to file the required reports with the Commodity Exchange; extensions of credit were made by appellant to all three of the co-defendants; the closing checks issued by the broker to the co-defendants were endorsed by appellant in the names of the payees; and, in the case of one of the checks payable to the business associate, Blacker, the check was endorsed

by Blacker in blank and then endorsed by appellant and deposited to appellant's account.

■ Taking the evidence on the placement of orders and communication with the broker, the pattern of trading, and the other indicia of appellant's control over the trading accounts and their proceeds in the light most favorable to the Government, as we are required to do, United States v. Kahaner, 317 F.2d 459 (2d Cir.), cert. denied, Corallo v. United States, 375 U.S. 836, 84 S.Ct. 73, 11 L. Ed.2d 65 (1963), we think the trial court was justified in finding guilt. The finding is supported by each of the theories advanced by the Government, namely that, contrary to 7 U.S.C. § 6a(2), appellant was "directly or indirectly" trading beyond Commission limits, or that the limits were exceeded, because 17 C.F.R. § 150.10(f) makes the limit applicable "to positions held by, and trading done by, two or more persons acting pursuant to an express or implied agreement or understanding, the same as if the positions were held by, or the trading were done by, a single individual."

The judge's acquittal of the co-defendants does not undermine his conclusion of appellant's guilt. The trial court found that the co-defendants "lent themselves" to appellant's unlawful conduct, but it could not find wrongful intent and willfulness on their part beyond a reasonable doubt; as the record stands, they may or may not have had knowledge of the trading limits.

The question of penalty is also raised, Does the statute as it read at the time of the offense and indictment make each individual transaction in excess of Commission limits a violation, in which case the trial court must be upheld, or does it apply only to a single course of conduct, in which event, if such course is continuous in nature as appellant's conduct here might be said to have been, only one violation warranting one $10,000 fine occurred? Appellant does not dispute the validity of the $10,000 fines on each of Counts Thirteen through Fifteen, although the trading on March 4, 1966, constituted a violation of both the position and the daily limits.

■ We think the statute unambiguous in making it unlawful for a person "to buy or sell, or agree to buy or sell" futures in excess of the authorized limits. Each purchase or sale or contract to buy or sell in excess of authorized limits thus constitutes a violation, just as in the case of mail fraud and securities fraud. Sanders v. United States, 415 F.2d 621, 626 (5th Cir. 1969), cert. denied, 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970). See also United States v. Greenberg, 30 F.R.D. 164, 168 (S.D.N.Y.1962); United States v. Hughes, 195 F.Supp. 795, 799 (S.D.N.Y. 1961). While it is true that United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952), held that certain Fair Labor Standards Act violations constituted but one course of conduct that could not support an independent sentence for each violation, this was in a case where Congress had not spoken unambiguously. In the present case Congress expressed in the statute a clear intention to eliminate excessive futures trading that can cause sudden or unreasonable fluctuations. Furthermore, as we pointed out in United States v. Cohen, 384 F.2d 699, 700 (2d Cir. 1967), the *Universal C.I.T.* case "has received rather limited application beyond the specific situation there presented."

It may be that appellant's argument would carry more weight under the commodity trading statute now in effect. In an attempt to close the loopholes evident in an enactment that was applicable only to purchases and sales or agreements to purchase and sell, Congress amended the act, along the lines of the broader language of the Commission regulations, to apply to a person holding or controlling a position in excess of po-

sition limits.* We need not interpret the amended act here, however, since the statute under which appellant was properly convicted applied to individual transactions and made no exception for those transactions occurring after the position limits had once been exceeded.

Accordingly, we affirm the judgment below.

* Subparagraph (B) was amended in 1968, Pub.L. 90–258, 82 Stat. 26, 27, to make it unlawful "directly or indirectly to hold or control a net long or a net short position in any commodity for future delivery on or subject to the rules of any contract market in excess of any position limit fixed by the commission for or with respect to such commodity : *Provided,* That such position limit shall not apply to a position acquired in good faith prior to the effective date of such order."