**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Edward Henry ASHDOWN and Charles E. Graham, Jr., Defendants-Appellants.**

**No. 73–3020.**

United States Court of Appeals, Fifth Circuit.

March 17, 1975.

Rehearing and Rehearing En Banc Denied April 17, 1975.

---

George Milman, for Graham.

Donald M. Re, Beverly Hills, Cal., for Ashdown.

William S. Sessions, U. S. Atty., San Antonio, Tex., Ralph E. Harris, Asst. U. S. Atty., El Paso, Tex., Robert G. Clark, Sp. Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, and COLEMAN and DYER, Circuit Judges.

DYER, Circuit Judge:

Graham and Ashdown appeal their convictions for securities fraud under 15 U.S.C.A. § 77q(a) and mail fraud under 18 U.S.C.A. § 1341. We affirm.

Both were convicted on ten counts of an eleven-count indictment.[1]   All counts

---

1.   The court directed a verdict of acquittal on Count 5 which alleged a telephone conversation in violation of 15 U.S.C.A. § 77q.

involve and incorporate by reference the basic scheme, outlined in Count 1. Graham and Ashdown were charged with employing a scheme to defraud in the offer and sale of common stock in Mountain State Development Co. (Mountain). Counts 1–8 (excluding count 5) each charge specific sales and mailings in violation of 15 U.S.C.A. § 77q(a), fraud in the offer or sale of securities by use of the mails. Counts 9, 10, and 11 incorporate the same scheme, but charge specific mailings in violation of the mail fraud statute, 18 U.S.C.A. § 1341. Thus, proof of a mailing in furtherance of the scheme is an element of each count.

Graham was the architect of the multi-faceted scheme. In July, 1967, he bought a controlling interest in Mountain, the stock of which had an "assessability" feature. The next day, at Graham's instance, Mountain entered into a contract with Graham Oil Company, of which Graham was the general managing partner, to purchase certain oil properties. An assessment of ten cents per share was levied in January, 1968, ostensibly to finance the purchase of the Graham Oil Co. properties. However, some of these properties were subject to prior assignments and liens, a fact which was never disclosed to the shareholders. Mountain received $290,000 from this assessment.

In the same summer, 1967, Mountain acquired two other properties: one, an oil property in Kern County, California, known as the Jones Lease, and the other a small battery company, Laser Power Industries (Laser). Mountain shareholders were informed of these acquisitions by letter.

In the following May, 1968, Mountain sold the assets of Laser to the city of Deming, New Mexico, under an "Industrial Revenue Project." The city used such projects to encourage industrial growth by buying the assets of a company and then leasing them back to an operating company which was to pay substantial rentals to the city. The city in turn would retire the bonds and interest out of that revenue.

The deal between Mountain and the city of Deming was closed on May 14, 1968. Under their arrangement, Mountain sold the assets of Laser to Deming in return for industrial revenue bonds. The Laser assets including equipment, inventory, goodwill, and patents, were then leased to a newly-formed Mountain subsidiary, Laser Power Industries of New Mexico (Laser New Mexico), which was to build a battery plant in Deming and be the operating company. Mountain also assigned the Jones Lease to Laser New Mexico to "reasonably insure" the success of the project.

The important feature of these industrial bonds is that the city incurs no liability whatsoever. If the operating company does not build a plant and operate it in Deming, the revenue bonds have absolutely no value. Yet they were listed in the 1967 Annual Report as "marketable securities." The shareholders were never informed of the city's very limited obligation.

Mountain was headquartered in El Paso, Texas, Graham's home town. It also maintained a Los Angeles office, with which Edward Ashdown became associated in the fall of 1967, and of which he became "office manager" sometime after the first of the year, 1968. It was at this point that Ashdown became an active participant in the scheme.

The day after the deal between Mountain and Deming was closed, May 15, 1968, Graham and Ashdown transferred controlling interest in Laser New Mexico to Manhattan West Corporation, a small corporate venture. However, a shareholder letter and the annual report, both issued subsequent to the deal, listed both the Jones Lease and Laser as assets of Mountain. The Manhattan West deal was never disclosed.

In July, 1968, Mountain bought certain mining claims in Honduras. Graham and Ashdown went to New York where they engaged a public relations specialist to prepare a press release concerning the Honduran property. The release, prepared and made public August 8, stated that Mountain held claims in Honduras

and that "independent engineering surveys and test cores drilled in one ten-mile span of river of the working area are assayed to contain recoverable precious metal of gold and silver valued in excess of $25 million." The reports on which this estimate was apparently based, later subpoenaed by the SEC, pertained to an entirely different river, and at any rate, did not justify the named figure.

The primary misrepresentations concerning the Deming bonds, the Laser assets, and the Honduran claims, were made in the 1967 annual report, which was distributed in mid-July, 1968, and the August, 1968, press release. Graham was primarily responsible for the preparation of the report, but Ashdown took an active part in its distribution. Both participated in the preparation of the press release. Both Graham and Ashdown traded heavily in Mountain stock, especially after the issuance of the annual report in mid-July and the August 8 press release. Much of Graham's selling was done through nominee accounts by a broker, Poulsen, in Salt Lake City. Both defendants touted the company and the stock to numerous witnesses.

█ Each defendant claims that, with regard to him, the evidence was insufficient to sustain his conviction. We find on the contrary that there was ample evidence to support the jury's finding that there was a scheme to defraud, that both defendants participated in the scheme, and that the mails were used in furtherance of the scheme. Indeed, the evidence was overwhelming.

Apart from the question of sufficiency of the evidence as to each, the defendants raise identical claims. Many of their assertions of error are without merit. Those which we deem worthy of discussion will be treated as to both Graham and Ashdown.

## I. VENUE

█ Although at trial, Ashdown moved for severance and a transfer to Los Angeles on the grounds of inconvenience and "in the interests of justice," defendants are here asserting that El Paso was a constitutionally improper venue. They claim that the only connection shown with Texas was the mailing of the annual report, and that the proof was insufficient to indicate that the mailing had anything to do with the scheme. However, the annual report and the misrepresentations it contained were a central part of the scheme. Furthermore, there were a great many other evidentiary connections with El Paso. It was Graham's home. Poulsen, the Salt Lake stock broker, mailed numerous notes regarding the nominee trading he was conducting to Graham in El Paso. He mailed checks to Graham which were deposited in El Paso banks. Graham maintained the headquarters office of Mountain in El Paso. Books were kept there; employees were paid there; the annual report was edited, printed, and mailed from there. In addition, some of the defrauded purchasers resided there. The Constitution requires that the trial shall be held in the state and district wherein the crime was committed. If there was any one scene of this crime, it was Texas.

## II. STATUTE OF LIMITATIONS

The scheme alleged in the indictment covered roughly the period from January 1, 1967, through December 31, 1968. The indictment was returned March 30, 1973. The parties agree that the five-year statute of limitations period of 18 U.S.C.A. § 3282 applies. Count 1 of the indictment, which outlines the scheme, includes several incidents which occurred prior to the limitations period. Graham and Ashdown assert that the jury might have based its guilty verdict on one or more of those acts occurring prior to March 30, 1968, evidence of which they contend was inadmissible.[2] In this contention, they misperceive the law.

---

2. Our review of the record discloses no objection made and no defense raised on the basis of the statute of limitations.

■ The statute of limitations is a defense to prosecution, not a rule of evidence. Therefore, once prosecution is timely instituted, the statute of limitations has no bearing on the admissibility of evidence. It would be a bizarre result indeed if a crime properly prosecuted within the limitations period could not be proven because an essential element, such as intent, could only be established by proof of incidents occurring outside the period.

■ Here, the evidence which the defendants question helps establish the scheme and the guilty intent. But the crimes alleged in every count are mailings in furtherance of the scheme. All of these mailings occurred within the statutory period; hence, there is no limitations problem. One on-going conspiracy is alleged. Although it began outside the limitations period it ended well within it. It is proper for the jury to infer one conspiracy starting before and ending after the statute of limitations period. United States v. Seuss, 1 Cir. 1973, 474 F.2d 385, cert. denied, 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155. Under similar circumstances, the Tenth Circuit found no statutory bar. In that case, a six-count mail fraud, the defendant made fraudulent representations in advertising letters and circulars. As in this case, the court admitted proof of transactions and events occurring more than five years prior to the indictment. Furthermore, in this case, as in United States v. Blosser, 10 Cir. 1971, 440 F.2d 697, "all uses of the mails shown to prove the offenses charged occurred within the period of the statute of limitations." Id. at 699. The evidence "bore on the existence of the scheme to defraud, the falsity of representations made, and intent." Id. Therefore, if the prosecution is timely with respect to the mailings alleged,

> [i]t is no defense that the scheme was formed earlier, and proof running back of the statute is admissible to show the scheme and intent if it is connected up with the scheme existing when use of the mails occurred.

Id. See also United States v. Brandom, 8 Cir. 1973, 479 F.2d 830, 831 n. 1. This Court has held that it is not the scheme to defraud, but the use of the mails to execute the scheme which constitutes the offense. Munch v. United States, 5 Cir. 1928, 24 F.2d 518, 519. Thus the prosecution here was timely, as it was within five years of each mailing alleged.

Therefore, there is no merit in the argument that it was error to admit evidence of acts committed beyond the statute of limitations period where the mailing offenses all occurred within the period and the evidence admitted helps establish the scheme.

### III. THE MAILINGS

Graham and Ashdown raise numerous claims with respect to the various mailings alleged in the indictment. These claims fall into two general categories: 1) whether the mailings were adequately proven, and 2) whether the mailings were sufficiently related to the scheme to provide a federal jurisdictional base. The mailings variously involve a bulk mailing of the annual report, the mailing of stock certificates and confirmations of purchase, and individual mailings of the annual report after stock was purchased.

### A. PROOF OF MAILING

■ Counts 1–4 allege that individual investors received copies of the 1967 annual report which was mailed in bulk from El Paso to the Mountain office in Los Angeles. Defendants claim that the mailing was not proven. However, there is ample evidence upon which a jury could find that such a mailing was made. The reports were printed in El Paso and delivered to the El Paso office. The secretary testified that they were distributed by mail at Graham's direction. The secretary in the Los Angeles office testified that they received "a couple of stacks" of the reports in the mail for distribution. This evidence leaves little doubt that a package of the reports was mailed from El Paso to Los Angeles. The Los Angeles office, under Ashdown's direction, distributed (in most cases,

mailed) individual copies of the report to the investors named in Counts 1–4. Thus, the proof of mailing on these counts was entirely adequate.

## B.  JURISDICTION

Defendants next contend that the mailings are not sufficiently related to the scheme to defraud to provide jurisdiction.  In Counts 6–8, the named investors received either stock certificates or confirmations of stock purchase through the mail.  Counts 9–11 allege specific mailings of the annual report which occurred after the initial stock purchases. Defendants challenge these various mailings as insufficient to confer jurisdiction either because reliance by the investor was not shown, or because mailings after the stock sale could not be "for the purpose of executing" the scheme.  Both of these arguments fail.

■■■  Specific reliance by the investor need not be shown in a prosecution under 15 U.S.C.A. § 77q(a).  Rather, what must be shown is that the scheme had an impact on the investor and that the mails were used in employing the scheme.  The Seventh Circuit case on which defendants rely states the proper standard:

> [T]he government must show some impact of the scheme on the investor and that the mails were used in those instances where the impact occurred. . . . The mail must be used *in* *employing* the scheme however incidental the mailings may be.

United States v. Schaefer, 7 Cir. 1962, 299 F.2d 625, 629–30.  This standard does not approach a "reliance" requirement.

■■■  Here, mailing was a basic part of the scheme.  There was ample evidence of the impact of the scheme on the investors in Counts 6–8 to support the guilty verdict.  Each received stock certificates or confirmations of purchase in the mail; such a mailing provided the jurisdictional base in McDaniel v. United States, 5 Cir. 1965, 343 F.2d 785.  This Court stated in that case that such a use

of the mails was "not a mere incidental use" but was an "integral part of the transaction." *Id.* at 787.  Furthermore, the testimony of each investor contained sufficient evidence of the scheme's impact on him to support the jury's verdict on these counts.  Each was influenced either by the misleading shareholder literature, including the annual report, or by Graham's representations, both direct and indirect.

■■■  Counts 6–11 are all challenged because the mailing involved occurred after the purchase of stock.  As we have already noted, the mailings in Counts 6–8 are sufficiently connected with the scheme under *McDaniel, supra.*  Counts 9–11, charging mail fraud under 18 U.S.C.A. § 1341, were all predicated upon mailings of the annual report.  Each investor in these three counts had already purchased stock before receiving the offending mailing.  However, it is a well-established principle of mail fraud law that use of the mails after the money is obtained may nevertheless be "for the purpose of executing" the fraud.

The Supreme Court considered this question in United States v. Sampson, 1962, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136, in which salesmen fraudulently obtained applications and advance payments from businessmen and then mailed acceptances to the defrauded victims to lull them into believing the service would be performed.  The Court held that such a "lulling" use of the mails was for the purpose of executing the fraudulent scheme.  There, as here, the whole scheme contemplated fraudulent activities both before and after payment was received.  There is no rule that the money must change hands after the mailing.

■■■  The Court recently phrased the test as "whether these mailings were sufficiently closely related to respondent's scheme to bring his conduct within the statute."  United States v. Maze, 1974, 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603.  Although in *Maze,* a credit card fraud, the Court found the

mailing insufficient, in doing so, it re-affirmed *Sampson.* Thus, post-purchase mailings which are designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are mailings in furtherance of the scheme. United States v. MacClain, 10 Cir. 1974, 501 F.2d 1006, 1012; *see also* United States v. Miles, 8 Cir. 1973, 483 F.2d 1372; United States v. Strauss, 7 Cir. 1971, 452 F.2d 375, 380, cert. denied, 1972, 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455; United States v. Porter, 8 Cir. 1971, 441 F.2d 1204, 1211.

In this case, each of the investors named in Counts 9–11 testified as to the "lulling" effect of the mailing. Receipt of the annual report in the mail was to each a factor, or the significant factor, in his retaining the stock in the belief (later proven false) that he had made a good investment. The lulling mailing was an entirely sufficient jurisdictional base', and the evidence entirely sufficient for conviction on these counts.

## IV. SENTENCES

Both defendants were found guilty on all ten counts submitted to the jury. Graham received a five-year sentence on Count 1, plus five years for each remaining count to be served concurrently, for a total of ten years imprisonment. Ashdown also received a five-year sentence on Count 1, but only two years concurrently for each remaining count, for a total of seven years imprisonment. Both Graham and Ashdown argue that because one conspiracy is charged and incorporated in all counts, in effect one crime has been committed carrying a maximum sentence of five years, and the sentences should therefore be merged. This argument, too, must fail.

This Court has considered essentially the same question in Sanders v. United States, 5 Cir. 1969, 415 F.2d 621, cert. denied, 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271. That case, too, concerned multiple counts of both mail and securi-

ties fraud. In addition, the indictment contained a separate conspiracy count. The defendant in *Sanders* urged that all the counts alleged but one crime with a maximum sentence of five years. This Court, however, noted that it is well settled that each separate use of the mails constitutes a separate offense and that consecutive sentences may be imposed for the substantive crime and conspiracy. *Id.* at 626.

In this case, that position is even stronger, because no conspiracy was charged. It avails defendants nothing that the same scheme is incorporated in each count; they were convicted of ten separate offenses based on ten different transactions. Sanders v. United States, *supra*; United States v. Austin, 10 Cir. 1972, 462 F.2d 724, 737–38; United States v. Amick, 7 Cir. 1971, 439 F.2d 351, 359; *see also* Pereira v. United States, 1954, 347 U.S. 1, 11, 74 S.Ct. 358, 98 L.Ed. 435; Johnstone v. United States, 5 Cir. 1969, 418 F.2d 1094; Milam v. United States, 5 Cir. 1963, 322 F.2d 104, 109.

## V. OTHER ERRORS

Defendants challenge the court's failure to instruct on a variety of issues. However, the court specifically invited objection to its jury charge but none was made; furthermore, when either Graham or Ashdown sought special limiting instructions, the court repeatedly inquired whether its instructions "satisfied" defense counsel and was assured that they did. Thus, absent plain error, the instructions must stand. Even were we to assume there was error, which we do not, there is without question nothing in the instructions which rises to the level of plain error.

These defendants have leveled a scatter-gun attack on appeal. Other errors asserted include ineffective assistance of counsel, prosecutorial misconduct, lack of confrontation, and prosecution under the wrong section of the statute. We have considered these and find them wholly without merit, even frivolous. When the attack is closely examined, the points

raised appear to be an amalgam of tenebrous theory and ingenious casuistry. These cannot be parlayed into a reversal.

Affirmed.