**UNITED STATES of America,**
**Appellee,**

v.

**John DIOGUARDI and Louis Ostrer,**
**Defendants-Appellants.**

**Nos. 113–114, Dockets 73–1759, 73–1769.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 13, 1973.

Decided Jan. 4, 1974.

**72**

Harold F. McGuire, Jr., Asst. U. S. Atty., S. D. N. Y. (Paul J. Curran, U. S. Atty., S.D.N.Y., S. Andrew Schaffer and John W. Nields, Jr., Asst. U. S. Attys., S. D. N. Y., on the brief), for appellee.

Gretchen White Oberman, New York City (Jay Goldberg, New York City on the brief), for appellant Dioguardi.

Sheldon H. Elsen, New York City (Orans, Elsen & Polstein, Lewis, Shapiro, Anthony J. Ferrara and Henry J. Boitel, New York City, on the brief), for appellant Ostrer.

Before LUMBARD, FRIENDLY and FEINBERG, Circuit Judges.

LUMBARD, Circuit Judge:

John Dioguardi and Louis Ostrer appeal from judgments of conviction entered on April 12, 1973, after a three-week jury trial held in January 1973 in the Southern District, and from the denial by Chief Judge Edelstein of new trial motions. The forty-count indictment was filed May 27, 1971, against the appellants and seven others.[1] Count one charged the defendants with conspiring, in violation of 18 U.S.C. § 371 to violate provisions of the federal securities laws and regulations, 15 U.S.C. §§ 77q(a), 77x, 78j(b), and 78ff, and Rule 10b–5, 17 CFR 240.-10b-5,[2] and the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343. The remaining counts charged substantive violations of these same provisions, except 18 U.S.C. § 1343.

On January 26, 1973, the jury found Ostrer guilty on eleven of the seventeen counts submitted to them by the court, and Dioguardi on four of the nineteen counts submitted as to him.[3] Prior to

---

1. Of the seven other defendants named in the indictment, three entered guilty pleas (Michael Hellerman, Fred Goodman, and Michael Caricato). Three were tried jointly in a separate trial and were convicted of one or two offenses (Gary Fredericks, Richard Greenberg, and Anthony Soldano), see United States v. Greenberg, 472 F.2d 1404 (2d Cir.), aff'd from the bench, Feb. 16, 1973. The case of the seventh defendant (Morris Winter) was not tried in view of his cooperation with the government and his guilty plea in a related case. Winter, Hellerman, and Goodman testified for the government, as did Steven Schoengold and Bruce Halpern, both named as co-conspirators.

2. 15 U.S.C. § 77q(a) codifies section 17(a) of the Securities Act of 1933, prohibiting fraud in the sale of securities. Wilful violation of this section is made criminally punishable by section 24 of the Securities Act of 1933, now 15 U.S.C. § 77x. Rule 10b–5 of the Securities and Exchange Commission (17 C.F.R. § 240.10b–5), which prohibits fraud or the use of manipulative devices in both

the purchase and sale of securities, was promulgated under 15 U.S.C. § 78j(b), originally section 10(b) of the Securities Exchange Act of 1934. Wilful violation of this rule is made criminally punishable by section 32(a) of the Securities Exchange Act of 1934, now 15 U.S.C. § 78ff.

3. Both defendants were found guilty on the conspiracy count (18 U.S.C. § 371). Ostrer was found guilty on the following substantive counts:

9—Causing a sale confirmation to be placed in the mail in furtherance of a fraudulent scheme for the sale of stock (15 U.S.C. §§ 77q(a), 77x);

16 through 19—Causing purchase confirmations to be placed in the mail as part of a manipulative device in contravention of Rule 10b–5 (17 C.F.R. § 240.10b–5; 15 U.S.C. §§ 78j(b), 78ff);

31, 33 through 36—Use of the mails as part of a scheme to defraud (18 U.S.C. § 1341).

Dioguardi was found guilty on only three of the substantive counts: 16, 17, and 31.

sentencing, the defendants moved for a new trial or, in the alternative, for an evidentiary hearing. The basis for this motion was an unsolicited letter from one of the jurors to Dioguardi which allegedly established the incompetency of that juror. In reliance on this, and on the provisions of 28 U.S.C. § 1865 (b)(4), they claim that they had been deprived of their right to have their case heard and decided by a panel of twelve competent jurors. Judge Edelstein denied the motion on April 12th. He sentenced Dioguardi to nine years' imprisonment and a $30,000 fine, and Ostrer to three years' imprisonment and a $55,000 fine.[4]

In addition to their objections relating to alleged juror incompetency, the defendants raise four other claims of error in the conduct of the trial: first, that the government prosecutor's argument in summation, to the effect that neither defendant called witnesses to contradict the government's testimony, was improper comment on each appellant's failure to testify in view of the assertion by each that he alone was in a position to contradict the government's witnesses; secondly, that it was error for the trial court to have refused to

charge, as requested, that the testimony of admitted perjurers and felons was to be scrutinized with care and caution; thirdly, that it was improper for the trial court to have ruled that Dioguardi's acquittal of another crime could not be proved when the government intended to utilize the acts underlying the acquittal to show a prior course of illegal conduct; finally, that consecutive sentences for Dioguardi on two of the counts charging securities law violations, counts 16 and 17, were improper since the underlying facts constituted only a single offense.

We find the defendants' arguments unpersuasive and we accordingly affirm the convictions below and let Dioguardi's sentences stand.

## I.

The evidence at trial revealed a scheme to manipulate the price of the stock of Belmont Franchising Corporation ("Belmont"), a substantially worthless over-the-counter security. The book value of the stock was almost negligible (Belmont's assets were essentially paper holdings in other concerns); it had been traded for only a short time for at most a few dollars a share.[5]

---

4. The sentences imposed by Judge Edelstein were as follows: in the case of Dioguardi, a prison term of 5 years and a $10,000 fine on count 1, 2 years and $10,000 on count 16 and similarly on count 17, and 5 years and $1000 on count 31; and in the case of Ostrer, 3 years and a $10,000 fine on count 1, 3 years and a $5000 fine on count 9, 2 years and a $10,000 fine on each of counts 16 through 19; 3 years on each of counts 31 and 33 through 35, and 5 years on count 36. Dioguardi's prison terms are consecutive, Ostrer's concurrent. The sentence imposed on Dioguardi on count 31 was suspended, with five years' probation. The sentence imposed on Ostrer on count 36 was also suspended, with one day's probation.

5. Belmont's initial offering of stock to the public was made in the spring of 1969. In an offering circular dated March 21, 1969, and under the statutory exemption from registration for small issues, Belmont offered 100,000 shares out of an authorized 1,000,000, par value 1¢, at an offering price of $3 a share. The circular stated that the

offering was speculative and that the price of the shares bore no relation to the book value of the company. In fact, at the time, Belmont's total assets amounted to roughly $10,000 and its liabilities to roughly $7000.

By October 20, 1969, according to the 2A form filed by Belmont with the Securities and Exchange Commission on that date, only 870 shares of the offering had been sold, with 99,130 unsold shares remaining.

On January 2, 1970, in exchange for a total of 195,000 restricted shares of Belmont stock, Belmont acquired 100% holdings in three other concerns: Top Secret International Programming, Slimerama International Corp., and Wonderful World of Grooming. Prior sales of these newly-acquired companies amounted to merely a few thousands of dollars, and net profits for each were about $1000. Nonetheless they listed total assets slightly in excess of $1,000,000. Top Secret International Programming listed a "computer program" valued at $500,000, and the other two enterprises each listed "formula rights" valued at $250,000. These assets were reflected in supplementary notes in

In January of 1970 Michael Hellerman, who pleaded guilty and testified for the government, began steps to drive up the price of Belmont stock, first to $5 or $6 a share and then to nearly $50 a share. At that time two stock manipulators, Anthony Soldano and Fred Goodman, in concert with Hellerman, commenced acquiring substantially all of the 28,720 known publicly tradeable shares of Belmont. Goodman and Soldano executed their purchases ostensibly through the open market, using brokers who quoted prices for Belmont through the National Quotation Bureau's pink sheets for over-the-counter securities. These purchases created the appearance of an active public market in the stock.

By early March, 1970 Goodman and Soldano had caused the market price of Belmont as quoted in the pink sheets to reach $15 a share. They did this primarily through directions to their brokers, who traded small quantities of the stock among themselves. In the meantime, Goodman and Soldano had acquired control, they believed, of all the outstanding stock.

At this point Hellerman's role became paramount. According to his testimony, he already had an understanding with Dioguardi that "whatever I did in the future, . . . he would have 25 per cent." It had also been agreed between Hellerman, on one side, and Goodman and Soldano on the other that once the price of Belmont stock reached $15, Hellerman and his associates would purchase all the stock at the $15 level, with a $5 per share kickback, prior to further manipulation upwards. In confirming this arrangement with Goodman and Soldano, Hellerman took Soldano to Dioguardi's office "to make sure it was on the record."

According to Hellerman, it was at this time in early March that he brought Ostrer into the scheme, although the two were only recently acquainted. Ostrer agreed to commit himself to buy 14,000 shares of Belmont at $15 a share ($210,000 total), with the understanding that he would split any future profits with Hellerman, that Hellerman would guarantee him against loss, and that a loan of the purchase money would be arranged so that he would not have to "lay out a quarter" of the $210,000. Purchase orders in Ostrer's name or in his behalf were to be made through various New York Stock Exchange firms.

Ostrer then placed orders in his own name and in his sister's for 14,000 shares of Belmont. However, most Exchange firms which he approached refused to accept his orders, and he was forced to place relatively large block orders through firms where brokers were already in league with Hellerman.[6]

Contemporaneously, Hellerman made arrangements with others to purchase the remaining 14,000 or so shares of Belmont. These individuals were able to pay the selling brokers (at the $15 a share price), but Ostrer was unable to raise the $210,000 needed to "hold up" his end of the deal, a circumstance which left his brokers unpaid. According to Hellerman, he thereupon obtained a loan for Ostrer through Dioguardi. The funds, totalling $60,000, came from Hickey DiLorenzo, at an interest rate of $1\frac{1}{2}\%$ a week. DiLorenzo also demanded and received $24,000 from Hellerman

---

Belmont's financial statements for the end of 1969, but the underlying statements of the three subsidiaries, conveniently acquired after the start of the year, were unaudited.

Belmont's second 2A statement, filed with the SEC in April, 1970, indicated that 28,720 shares of the March 21, 1969, offering had been sold, and that no more of the original 100,000 shares were still being offered.

**6.** Among these orders were ones through Bruce & Co. on March 10, 1970, for 2000

shares, and through Kelsey & Co. on March 11, 1970, for 3500 shares. Co-conspirator Bruce Halpern, see fn. 1 supra) was a principal of Bruce & Co. Co-conspirator Schoengold was a vice president of Kelsey & Co., and Hellerman was an undisclosed owner of Kelsey.

These particular purchases on March 10th and 11th are relevant to defendant Dioguardi's challenge (discussed further below) to alleged pyramiding of offenses.

for this favor (part of the kickback profits already made). In addition, Hellerman also advanced Ostrer $52,500, and Ostrer obtained the balance he needed from other sources.

Thereafter, from the end of March through late April, 1970, Hellerman directed purchases' and sales of Belmont stock at ever-increasing prices among the individuals and brokers whom he controlled. He kept Dioguardi, Ostrer, and DiLorenzo informed as the price rose. He also arrranged for Ostrer to sell off enough stock, through a nominee, to repay the $60,000 loan from DiLorenzo—with a $1700 profit left over which he split with Ostrer. By the end of April he had received approximately $140,000 in kickbacks from Goodman and Soldano. He gave $30,000 to Dioguardi, and invested $9,000 more in a business in which Dioguardi had an interest.

In early May, 1970, the scheme failed. The president of Belmont through a broker unknown to the manipulators, began to sell heavily his own "investment" stock in the corporation. The market was unable to absorb the sales, and Hellerman was unwilling to buy the stock and could not find other purchasers. Consequently the market for Belmont collapsed, leaving Ostrer (among others) with large quantities of unsold stock. Ostrer then tried to hold Hellerman responsible for his losses. Hellerman became worried because DiLorenzo took Ostrer's side. Dioguardi subsequently arbitrated the dispute to some extent, and arranged for partial compensation to Ostrer to the sum of $25,000.

At trial Dioguardi called no witnesses and based his defense primarily on cross-examination going to the lack of credibility of the government's major witnesses, who were all accomplices. Ostrer did not testify but he did call two witnesses whose testimony indicated that Ostrer had been a "victim" of Hellerman's machinations.

About ten days after trial, Dioguardi received a letter from one of the jurors, Miss Genena Rush, a nurse's aide employed at Flower Fifth Avenue Hospital in New York City. The letter was written on stationery bearing the zodiac sign of Libra, and on one page the legend that it was "the heavenly house under which I was born." The juror wrote of her clairvoyant powers which enabled her to see that Dioguardi was basically a good person. She stated her belief that he was guilty, "Your mistake your guilty," and questioned him about Hellerman, "Why you let such a relationship exist between you and a man like Hellerman?," and called upon him to repent, "One word appear before me *repent*. If you repent and run a clean business it is the good within you that will save you, and you will gain what you have lost." Miss Rush stated that

> I have eyes and ears that I can see things before it happen. I can tell you about other and what they are thinking and doing.

and that her eyes

> are only partly open . . . . Unfortunate, a curse was put upon them some years ago. I have some people working on them.

The letter is reproduced in full in the margin. [7]

7. Miss Rush's letter reads as follows:

<div style="margin-left:2em">

521 W 152 Street,
New York, N.Y. 10031
February 8th—1973

Dear Mr. Dioguardi,

Under the situation and such circumstance I hope that I have made the right decision. I talk to my friends Bertha and her husband Olive about this, Olive agree that I write to you. Bertha, however, was against it. Nevertheless, I felt I had to write you. I cannot omit what I have seen. When I saw the good within you and how hard your wife was trying; I prayed about it. One word appear before me *repent*. If you repent and run a clean business it is the good within you that will save you, and you will gain what you have lost. Before I continue I must explain something to you. I have eyes and ears that I can see things before it happen. I can tell you about other and what they

</div>

Dioguardi's attorneys sent copies of the letter to seven psychiatrists, all of whom responded (one in an affidavit) to the effect that, in their opinion, what Miss Rush had written indicated hallucinatory tendencies, symptoms of possible psychosis, paranoia, and grandiosity, and in general an inability to appreciate reality without fantasizing.[8] The psychiatrists also pointed out that further psychiatric analysis was needed before a diagnosis could be ventured with any certainty, or before it could be said that Miss Rush's infirmities, whatever their nature and extent, might have rendered her unable to comprehend the proceedings at trial.[9] The psychiatrists were given no information about the

are thinking and doing. If I am wrong about this it is the first time.

I would like to visit you. I would like to talk to you about what appear before me. I would like to do so when my eyes fully open. They are only partly open. I don't know at the present when they will open. Unfortunate, a curse was put upon them some years ago. I have some people working on them. Everything is being done that can be done. So we will have to wait. As I stated I cannot omit what appear before me, when I was on the jury bench. You feel that this is the end for you. However, it is not. Something appear before me that I must do. It is the good within you that I must use and within that good, you will gain what you have lost. If, however, I am wrong it is the first time.

Why, you let such a relationship exist between you and a man like Hellerman? When I think of the good that I saw within you it does not add up. Where did Hellerman get those fur coats? Does he have any for sail? Omit the question. I really can't afford one, and if I could I probably be afraid to wear it.

Why persecute your wife? Your mistake your guilty then take it out on her. The ordeal you put her through I wonder how she survive through it. One word appear before me brave. She is a brave girl. She love you. She never stop loving you not a single moment. Tell her to please be careful. From what I can see she is still in business. I suggest it is not wise at this time. I believe she is being watch.

That was a good lawyer you had. I entain to send him some custom as soon as my eyes open.

Tell Ostrer I am praying for him.

*Mr. Dioguardi*, I want to ask a favor of you please.

I want you to look upon me as a woman and I look upon you as a man and not white man and black woman. Olive agree with me.

Let's leave color out, *OK*.

I was told you will only have to serve one third of the time given. So relax this is not the end. Soon you will be free.

When I call the Federal information center and the record room yesterday they all know you. They all seem to have it in for you. Its seated deep within them like a personal matter.

Sincerely,
Genena

The letter sheets were printed with the word "LIBRA" and a picture of a woman with scales. On the last page of the letter, under the picture, Miss Rush wrote, "The sign Libra is the heavenly house of the zodiac under which I was born." The letter was addressed to "Mr. John Dioguardi, Federal Correction Institution, Dan Bury, Conn. 06813."

8. The copy of the letter which Dioguardi's attorneys used at first was not the original from Juror Rush. Rather it was a handwritten copy which Dioguardi had made of the original and which he had forwarded to them. Somewhere in transcribing the word "omit" was changed to "admit" in the fifth sentence of the first paragraph and also in the ninth sentence of the second paragraph. Thus "I cannot omit what I have seen . . ." became "I cannot admit what I have seen . . ." and, similarly, "I cannot omit what appear before me . . ." became "I cannot admit what appear before me. . . ." Six of the seven psychiatrists (all except Dr. Portnow) received their copy of the letter in this incorrect form. These errors may have influenced their reading and subsequent analysis of the letter, but we do not think significantly. The defendants' contentions concerning the competency of Miss Rush rest as much on the letter taken as a whole as on any particular sentences. While not belittling its importance, we do not think that reliance on the incorrect word "admit" was, as the government contended, "the cornerstone of [the] various psychiatric opinions."

9. The supporting letters of the psychiatrists and the affidavit of Dr. Portnow need not be set out at length. Samples of their conclusions are as follows:
1.) Dr. Stanley L. Portnow (affidavit of April 2, 1973):
[T]he letter makes a positive presumptive showing that . . . the juror suffered from a chronic psychotic thought disorder

which so severed her relationship with reality that she was unable to exercise critical judgment or to function in an unbiased manner in the evaluation of evidence produced at the trial. Indeed, it would appear that her unsoundness of mind was so overwhelming that she was subject to auditory and visual hallucinations, delusions and a belief in her own omnipotence.

The exact nature of the type of psychosis which the juror is afflicted, can be further investigated. . . . Such an investigation would entail clinical psychiatric interviews and, of particular importance, psychological testing. . . .

2.) Dr. Samuel C. Karlan (letter of March 15, 1973) :

It is clear from this letter that this patient is having imaginations about what she can see and what she can do and these are in the form of visual hallucinations and apparently auditory hallucinations. It is also clear from this letter that she had these visions while she was on the jury.

It is therefore my opinion that the letter is evidence that this patient underwent a psychotic episode while she was on the jury and while she wrote this letter, which is suggestive of a schizophrenic mechanism and that she was not in contact with reality.

3.) Dr. Robert W. Damino (letter of March 15, 1973) :

The contents of the letter written by Gemena *(sic)* Rush indicate that she is substantially disturbed in reality relationships . . . that she was having visual hallucinations . . . [and] that this woman was making an identification with the accused. . . .

[A]t the time she served on the jury she was utterly incapable of thinking logically as to the evidence, and utterly incapable of properly evaluating the evidence.

4.) Dr. Jerry C. Atkins (letter of March 16, 1973) :

My impression is judging from this letter Miss Rush would have had great difficulty exercising sound judgment during the trial mentioned in her letter. Her religious convictions could be classified as being ideas of grandiosity and furthermore there is evidence of auditory and visual hallucinations *(sic)* in her description of herself.

5.) Dr. John J. Vetter (letter of March 15, 1973) :

[T]here is clear cut evidence of mental disorder. . . . The abnormal thinking processes, impairment of judgment, hallucinatory experience and delusional belief directly involving the case at hand, would indicate an incapacity, by reason of mental infirmity, to render efficient jury service, or to have functioned efficiently as a juror in the case concerned. 6.)

Dr. Arnold H. Zucker (letter of March 5, 1973) :

The writer is emotionally involved with Mr. Dioguardi, in an intensive manner.

The writer is concerned with Mr. Dioguardi's welfare and fate.

The writer wishes to be helpful and supportive.

The writer believes she possesses powers of clairvoyance and feels impelled to act upon her revelations.

The writer experiences guilt about Mr. Dioguardi's incarceration. She is convinced about his "bad" behavior (wrongdoing, association with "a man like Hellerman") but "sees" the "good" in him. Her responses are somewhat appropriate in the context of her educational, cultural, and religious background. To alleviate her guilt feelings and "save" Mr. Dioguardi, she urges him to "repent", mend his ways, and maintain his faith. . . .

I believe that the data suggests the following psychodiagnostic impressions, which require clinical confirmation (psychiatric evaluation of the writer).

1. Above the cultural-religious beliefs, *autistic* (pathological fantasy preoccupation) *trends* are indicated. . . .

2. *Paranoid trends* are significant. . . .

. . .

[M]y psychiatric impression is that of a highly paranoid, autistically preoccupied (probably psychotic) individual, who has maintained fairly adequate external controls and functioning, but who may be decompensating due to the strong emotions produced by her role in the trial.

7.) Dr. Donald M. Brough (letter of February 28, 1973) :

[T]his letter was written consciously with every good intention on the part of Mrs. *(sic)* Rush in an effort to be helpful to Mr. Dioguardi. However, . . . the writer was here showing evidence of being hallucinated, delusional and would prove to be suffering from a Paranoid Condition.

Taking it in a far less literal fashion, allowing the greatest degree of latitude interpreting what she wrote, so that it can be taken as a somewhat picturesque, idiosyncratic expression of her ideas, influenced by educational, cultural and religious factors, I still would find important grounds for believing that the letter shows that she was involved in this situation in a very unreal and unusual way.

In my opinion it is most likely that she is, in fact, suffering from a Paranoid Condition in which she has hallucinatory experiences and delusional thinking.

juror or about the trial and the issues, and the court had forbidden anyone to seek to interview her.

On the basis of Miss Rush's letter and the opinions of the psychiatrists, Dioguardi and Ostrer moved pursuant to Rule 33, F.R.Crim.P., for a new trial or in the alternative, for an evidentiary hearing on the competency of Miss Rush as a juror. They asserted that an uncontroverted showing of incompetency had been made out, in violation of 28 U. S.C. § 1865(b)(4) and their constitutional rights.[10]

Judge Edelstein, after hearing oral arguments and receiving briefs, denied the motion for a new trial and for further investigation of the juror's competency on April 12, 1973, and later filed a thorough and considered opinion on July 18, 1973. 361 F.Supp. 954. He stated:

> Moreover, there was nothing in the demeanor of the juror during *voir dire,* trial or deliberations to indicate that she was anything but competent to serve on the jury. On *voir dire,* the jurors were asked group questions in an effort to elicit from them their feelings of bias or prejudice which would prevent them from rendering a fair and impartial verdict. [footnote omitted] In direct colloquy with me, the juror answered directly and responsively, stating that she understood my questions and comments, and specifying the particular one which applied to her. Nothing in her responses and demeanor indicated that her reasoning abilities or mental processes were deficient. Indeed, her ability to recall

> my questions applicable to her, conveyed the opposite impression. Likewise, during the three weeks of trial and three days and nights of deliberations, I did not notice anything unusual about her. Nor was anything unusual concerning her brought to my attention by either the attorneys or jurors.

> Examination of the juror on the voir dire had disclosed that she was then employed by Flower Fifth Avenue Hospital as a patient attendant assisting the nurses and had been so employed for four years. In answer to the court's question as to whether any questions or comments applied to her, she stated that in 1944 she was employed by the Navy Department in Cleveland as assistant to the foreman in the cleaning department. Prior to her current hospital employment she was a silk finisher in a cleaning shop in the Bronx.

### II.

*A—Competency of Juror Rush*

■ It is well settled that only clear evidence of a juror's incompetence to understand the issues and to deliberate at the time of his service requires setting aside a verdict. And only strong evidence that it is likely that the juror suffered from such incompetence during jury service will justify an inquiry into whether such incompetence in fact did exist. In our view the juror's letter, and the essentially horseback uninformed opinions of the psychiatrists regarding the letter, fall considerably

---

Whatever the court may consider the proper steps to take in regard to any other aspect of the case, it would be my hope that further psychiatric examination would be gently encouraged upon her, and that she would be willing to cooperate.

10. 28 U.S.C. § 1865, which is part of the Jury Selection and Service Act of 1968, P.L. 90–274, 82 Stat. 53, provides in relevant part as follows:

(b) In making such determination [whether a juror is qualified to serve] the chief judge of the district court, or such

other district court judge as the plan may provide, shall deem any person qualified to serve on grand and petit juries . . . unless he . . .

(4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service. . . .

The Act provides no guidelines, however, for what procedures are to be followed where there is, after trial, discovery of possible grounds for juror disqualification. However, see fn. 12, below. See also ABA Standards Relating to Trial by Jury, Parts II, V, and Commentary (Approved Draft 1968).

short of justifying any further inquiry. Furthermore, the appellants have not cited a single authority which supports a grant of their motion on this record. Judge Edelstein was entirely correct in denying the motion.

■ Reluctance to inquire into the state of mind of any juror and into the conduct of the jurors during their deliberations rests on sound reasons.[11] The rule against any inquiry whatever recognizes exceptions only where there is clear and incontrovertible evidence of incompetence shortly before or after jury service, clear evidence of some criminal act, or evidence of some "objective fact" of internal impropriety.[12] Even in the case of recent incompetence a hearing will be had to establish that it must have existed during jury service.

The strong policy against any post-verdict inquiry into a juror's state of mind was stated by this court regarding an analogous situation in United States v. Crosby, 294 F.2d 928, 950 (2d Cir. 1961), cert. denied sub nom. Mittelman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962):

There are many cogent reasons militating against post-verdict inquiry

---

11. See 8 Wigmore, Evidence §§ 2349, 2352–2354 (McNaughton rev., 1961). As the Supreme Court said in Stein v. New York, 346 U.S. 156, 178, 73 S.Ct. 1077, 1089, 97 L.Ed. 1522 (1953):

Nor have the courts favored any public or private post-trial inquisition of jurors as to how they reasoned, lest it operate to intimidate, beset and harass them. This Court will not accept their own disclosure of forbidden quotient verdicts in damage cases. McDonald v. Pless, 238 U.S. 264, [35 S.Ct. 783, 59 L.Ed. 1300]. Nor of compromise in a criminal case whereby some jurors exchanged their convictions on one issue in return for concession by other jurors on another issue. Hyde v. United States, 225 U.S. 347, [32 S.Ct. 793, 56 L.Ed. 1114]. "If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." McDonald v. Pless, [238 U.S. 264 (1915)] at pages 267–268 [35 S.Ct. at page 784].

12. See 18 U.S.C. §§ 245(b), 1503, 1504. See also 28 U.S.C. § 1867(f). Such exceptions as these which the law has condoned to the privacy and sanctity of the jury reflect the need to preserve its impartiality. The quickness with which jury findings will be set aside when there is proof of tampering or *external* influence, and the severe penalties imposed on those who attempt such interference, parallel the reluctance of courts to inquire into jury deliberations when a verdict is valid on its face. See Mattox v. United States, 146 U.S. 140, 149–150, 13 S. Ct. 50, 36 L.Ed. 917 (1892). Such exceptions support rather than undermine the rationale of the rule that possible *internal* abnormalities in a jury will not be inquired into except "in the gravest and most impor-

tant cases." McDonald v. Pless, 238 U.S. 264, 269, 35 S.Ct. 783, 785, 59 L.Ed. 1300 (1915).

These considerations explain the one exception to the rule against a jury impeaching its own verdict allowed in those instances when the evidence offered of internal impropriety concerns "objective facts." This "distinction between what may and what may not be established by the testimony of jurors to set aside a verdict" has been recognized by the Supreme Court. See Mattox v. United States, *supra*, 146 U.S. at 148–149, 13 S. Ct. 50. However, courts have invoked the exception and permitted inquiry into a jury's deliberation only when there has been a strong showing of "objective" impropriety, such as blood relation between juror and defendant or extraneous material brought to the jury's attention during deliberations. As the Supreme Court said in United States v. Reid, 53 U.S. 361, 366, 13 L.Ed. 1023 (1851), "[C]ases might arise in which it would be impossible to refuse [evidence of impropriety] without violating the plainest principles of justice." But "[u]nquestionably such evidence ought always to be received with great caution." Nor has the Court seen fit since then to relax its position, McDonald v. Pless, *supra*, 238 U.S. at 269, 35 S.Ct. 783. See Rotondo v. Isthmian Steamship Co., 243 F.2d 581, 583 (2d Cir. 1957); United States v. Crosby, 294 F.2d 928, 949–950 (2d Cir. 1961), cert. den. sub nom. Mittelman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed. 2d 523 (1962); 8 Wigmore, Evidence § 2349 (McNaughton rev., 1961). See also ABA Standards Relating to Trial by Jury, Sec. 5.-7; United States ex rel. Owen v. McMann, 435 F.2d 813 (2d Cir. 1970), cert. denied, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971); and Judge Friendly's discussion in Miller v. United States, 403 F.2d 77 (2d Cir. 1968), fn. 11, at 83–84.

into jurors' motives for decision. The jurors themselves ought not be subjected to harassment; the courts ought not be burdened with large numbers of applications mostly without real merit; the chances and temptations for tampering ought not be increased; verdicts ought not be made so uncertain.

We cited this language in Miller v. United States, 403 F.2d 77 (2d Cir. 1968) where the court also emphasized, at page 82, the importance of the dangers presented by inquiries that go beyond objective facts: "inhibition of jury-room deliberations, harassment of jurors, and increased incidence of jury tampering." See also Stein v. New York, 346 U.S. 156, 178, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); McDonald v. Pless, 238 U.S. 264, 268, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); and Mattox v. United States, 146 U.S. 140, 147–151, 13 S. Ct. 50, 36 L.Ed. 917 (1892).

■ With respect to post-verdict evidence of possible juror incompetency during the trial, courts have refused to set aside a verdict, or even to make further inquiry, unless there be proof of an adjudication of insanity or mental incompetence closely in advance of the time of jury service.[13] Only when proof of this nature has been offered, or proof of a closely contemporaneous and independent posttrial adjudication of incompetency,[14] have courts conducted hearings to determine whether the disability in fact affected the juror at the time of trial.

But absent such substantial if not wholly conclusive evidence of incompetency, courts have been unwilling to subject a juror to a hearing on his mental condition merely on the allegations and opinions of a losing party. In Peterman v. Indian Motorcycle Co., 216 F.2d 289 (1st Cir. 1954), the plaintiff, shortly after judgment against him in a civil suit for personal injury, moved for a new trial on the grounds "that certain information, discovered since the trial, disclosed the mental unfitness of the foreman of the jury, whose condition, if it had been known . . . would have been a ground for disqualification." Judge Wyzanski heard counsel on the motion and requested an offer of proof from the plaintiff's attorney.

The offer of proof was . . . that the juror in question, because of his mental disturbance, has been receiving disability compensation from the Veterans Bureau; that he has difficulty in sleeping and concentrating; that his memory is not good; that he has had depressed periods during which he entertained the idea of suicide; that he has had to undergo treatment for anxiety reaction to a psychic episode expressed by auditory hallucinations; that he has been under the care of a psychiatrist for an extended period, with little prospect of an early overcoming of his difficulties. [*Id.*, at 293.]

Judge Wyzanski held that the offer of proof was inadequate and denied the plaintiff's motion.[15] The Court of Ap-

---

13. See Anderson v. State, 54 Ariz. 387, 96 P.2d 281 (1939); Grand Lodge A.O.U.W. of Ark. v. Wood, 113 Ark. 502, 168 S.W. 1070 (1914); Austin v. People, 106 Colo. 506, 107 P.2d 798 (1940); Brown v. State, 219 Ark. 647, 243 S.W.2d 938 (1951); Ex parte Lovelady, 152 Tex.Cr.R. 93, 207 S.W.2d 396 (Tex.Cr.App.1947), cert. granted, 333 U.S. 867, 68 S.Ct. 787, 92 L.Ed. 787, cert. dism., 333 U.S. 879, 68 S.Ct. 914, 92 L.Ed. 1154 (1948); Durham v. State, 182 Tenn. 577, 188 S.W.2d 555 (1945); State v. Bucy, 104 Mont. 416, 66 P.2d 1049 (1937); Eastman Kodak Stores, Inc. v. Summers, Mo.App., 377 S.W.2d 476 (Kan.C.C.A.1964).

14. See Jordan v. Massachusetts, 225 U.S. 167, 32 S.Ct. 651, 56 L.Ed. 1038 (1912), aff'g Commonwealth v. Jordan, 207 Mass. 259, 93 N.E. 809 (1911); State v. Camp, 110 W.Va. 444, 158 S.E. 664 (1931); Burik v. Dundee Woolen Co., 66 N.J.L. 420, 49 A. 442 (1901); Iverson v. Prudential Ins. Co. of Amer., 126 N.J.L. 280, 19 A.2d 214 (1941); State v. Welty, 65 Wash. 244, 118 P. 9 (1911).

15. It is not clear to what extent Judge Wyzanski treated the plaintiff's motion for a new trial in *Peterman* as also being a motion for conducting a hearing into the juror's competency. But evidently no hearing was thought required and none was held.

peals for the First Circuit agreed, stating that:

> Considering the strong policy against the too-ready impeachment of jury verdicts on the basis of such afterthoughts suggested by a disappointed litigant, . . . the trial judge cannot be held to have abused his discretion in declining to grant a new trial on this ground. [*Id.*]

See also United States ex rel. Daverse v. Hohn, 198 F.2d 934 (3rd Cir. 1952).

In light of this legal background, we do not believe appellants made enough of a case to justify further inquiry into the competence of Juror Rush. No evidence was offered of any history of mental instability on the part of Miss Rush, much less evidence of any adjudication of insanity or incompetence. Indeed, what we do know of her past, although it is little, reflects quite the contrary situation. She has held steady employment over the past four years as a nurse's aide at Flower Fifth Avenue Hospital, and apparently had steady employment before that as well. The trial judge, as noted above, found the juror alert and responsive and he noted nothing unusual about her during the three weeks of trial and three days and nights of deliberation. Although the opinions of experts are not to be dismissed altogether, they were here of necessity formed in a vacuum, based on one piece of evidence, and fall far short of constituting the sort of "objective fact" which can justify inquiry into the internal workings of the jury. The fact that there is no evidence of harassment of Miss Rush or solicitation of the letter does not render irrelevant the policy considerations which forbid inquiry into the internal workings of the jury absent objective evidence of impropriety. In another case a letter could be fabricated or solicitation could be disguised; a decision for appellants on this issue would therefore raise very real risks of "inhibition of jury room deliberations, harassment of jurors, and increased incidence of jury tampering." Indeed, even where such a letter is as fully voluntary

as the one in this case appears to be, it surely was not thought by its author to be an invitation to "develop evidence by investigating the juror's background or by persuading her to undergo a voluntary mental examination"—the suggestions of the dissent for possible proceedings on remand. We conclude that the action of the district court in denying the defendants' motion was entirely proper.

*B—Prosecutor's Comments in Summation*

The government prosecutor, in his summation, noted that, apart from the two quasi-character witnesses called by defendant Ostrer, the defendants had called no witnesses to contradict the factual content of the government's case. Defense counsel objected to these remarks, and the appellants argue that the remarks were improper in that only they themselves (or co-conspirators whose testimony they could not compel) could have testified in contradiction to the government's witnesses. We do not agree.

█ It is true that it has been frequently held impermissible for the prosecution to comment on a defendant's failure to call witnesses where only the defendant could offer countertestimony or where the jury will "naturally and necessarily" interpret this as a comment upon the defendant's silence, otherwise constitutionally protected. See, e. g., United States v. Lipton, 467 F.2d 1161 (2d Cir. 1972); United States v. Flannery, 451 F.2d 880 (1st Cir. 1971); United States v. Handman, 447 F.2d 853 (7th Cir. 1971); Desmond v. United States, 345 F.2d 225 (1st Cir. 1965).

█ However, this danger can be neutralized by a prompt corrective instruction to the jury. Such an instruction was given by Judge Edelstein. Moreover, this was not the close situation in which it was a question of a defendant's word against the word of one other (cf. *Handman*, where the defendant was implicated solely by an inform-

er's testimony about a telephone conversation between himself and the defendant). Thus, even though many of the meetings between Hellerman, Ostrer, Dioguardi, and DiLorenzo were private, their activities also involved numerous stock brokers and other Wall Street figures, several of whom also testified at trial. See fn. 1, *supra.* Given the breadth of the operation, it was not improper for mention to have been made of the dearth of defense witnesses from so large a cast of characters. The record supports the conclusion that there were meetings between the persons involved in the Belmont stock manipulation at which more were present than the defendants and the government's witnesses at trial, and that some of these persons could have been called to testify or at least that in many other ways defendants could have waged factual war with the detailed evidence of the government's witnesses.

In United States ex rel. Leak v. Follette, 418 F.2d 1266 (2d Cir. 1969), cert. denied, 397 U.S. 1050, 90 S.Ct. 1388, 25 L.Ed.2d 665 (1970) which concerned similar comments by the prosecutor on the strength of the government's case against the accused and on the lack of any contradictory evidence, we reviewed the many precedents which, in almost every instance, have "held that remarks concerning lack of contradiction are forbidden only in the exceedingly rare case where the defendant alone could possibly contradict the government's testimony," *id.*, at 1269, and then concluded that

> where the prosecutor confines himself to arguing the strength of his case by stressing the credibility and lack of contradiction of his witnesses, we will not be astute to find in this a veiled comment on the defendant's failure to testify even if in practical fact, although not in theory, no one else could controvert them. [Id., at 1270.]

The defendants' objections to the prosecutor's comments in summation were properly denied.

## C—Specific Charge on Accomplice Testimony

■ Both defendants argue that it was error for the trial court to have refused to instruct the jury specifically that the testimony of accomplices who were confessed perjurers or convicted felons was to be scrutinized with particular care. There is no merit to this argument. The trial court's charge to the jury was amply cautionary on this point. A similar charge was recently sustained by us in United States v. Projansky, 465 F.2d 123, 136–137 and nn. 24–25 (2d Cir.), cert. denied, 409 U.S. 1006, 93 S. Ct. 432, 34 L.Ed.2d 299 (1972).

## D—The Evidentiary Ruling

■ At one point in the trial Hellerman testified that Dioguardi had used some of the proceeds of the Belmont stock scheme to help pay off a mortgage on his summer home. Apparently this statement was incorrect. To help pay off the mortgage Dioguardi had used funds obtained through a prior stock manipulation, but one on which he had been acquitted at a previous trial. At the side bar, counsel for Dioguardi argued that the prosecution should correct Hellerman's testimony. The trial court stated that correction was properly the responsibility of defense counsel. Dioguardi's lawyer, however, was unwilling to raise the issue unless proof could also be introduced of the earlier acquittal. The trial judge at this point expressed himself somewhat ambiguously, and the parties differ whether we should read him as having refused to give a ruling in advance on the question whether he would allow proof of acquittal, holding that admissibility would depend on the course of testimony, or as having held that proof of acquittal would not in any case be admissible in this context. In either event, as a consequence of the trial judge's action, Hellerman's testimony was allowed to stand, and the issue was not raised again.

Dioguardi claims that the court's ruling or failure to rule was improper and

that it permitted false testimony to reach the jury. This claim, while perhaps technically valid, is essentially groundless. The circumstances behind the controversy at issue were never pursued in testimony in open court. No facts behind it were ever in evidence. While the record does reveal occasional allusions to the prior stock manipulation, the so-called "Imperial deal," none of these could be considered prejudicial in reference to Dioguardi. Hellerman's statement was *de minimis* in view of the other evidence. No reversible error was committed by the trial court under the circumstances. It was a matter fully within the trial court's discretion. See United States v. Kahn, 472 F.2d 272, 282 (2d Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973).

*E—Consecutive Sentences for Stock Fraud*

 Lastly, Dioguardi claims that it was improper for the trial court to impose separate consecutive sentences and separate fines upon him for the violations in counts 16 and 17 of the indictment. Count 16 involved confirmation of the purchase in Ostrer's name, with Dioguardi's approval, of 2000 shares of Belmont stock through Bruce & Co. on March 10, 1970. Count 17 involved confirmation of the similar purchase of 3500 shares through Kelsey & Co. on March 11th. See fn. 6, *supra*. Dioguardi argues that these purchases, and their confirmations, were part of a single transaction, namely Ostrer's purchasing half (14,000) of the supposed outstanding shares of Belmont stock, and that hence they cannot constitute separate violations of the securities laws.

It is true that there has been debate in the past over whether such transactions constitute a multiple offense, the essence of the violation being illegal use of the mails, or a single offense, the essence being fraud. See 3 Loss, Securities Regulation 1521 (2d ed., 1961); and also United States v. Hughes, 195 F. Supp. 795 (S.D.N.Y.1961). However, recent litigation involving fraud under the securities laws has resolved this debate in favor of the position that each transaction in a securities fraud case constitutes a separate offense. Sanders v. United States, 415 F.2d 621 (5th Cir. 1969), cert. denied, 397 U.S. 976, 90 S. Ct. 1096, 25 L.Ed.2d 271 1970); see also United States v. Binstock, 37 F.R.D. 13 (S.D.N.Y.1965). This position acknowledges the fact that activity such as the kind Dioguardi engaged in here in relation to the two Ostrer purchases on March 10th and 11th was fraudulent in each instance, not necessarily in respect to the scheme as a whole, nor even necessarily in respect to the sellers on those two days (who may have been coconspirators or perhaps simply others pleased to sell at a gain), but in respect to the investing public. Thus although a situation can be envisioned in which consecutive sentences on multiple fraud convictions would be questionable, *cf.* United States v. Brown, 36 F.R.D. 207 (D.D.C.1964), in the instant case the determination and sequence of the sentences imposed on defendant Dioguardi were matters within the discretion of the trial court. See Sanders v. United States, *supra*, 415 F.2d at 626, and the cases there cited. The consecutive sentences on counts 16 and 17 were therefore proper.

Judgments of conviction affirmed.

FEINBERG, Circuit Judge (dissenting):

The majority opinion holds that an unsolicited, bizarre letter from a juror, who claims to be able to "see things before it happen" and to know what other people "are thinking," does not justify further inquiry into the juror's competence, even though seven psychiatrists preliminarily diagnose her as mentally ill. From this holding, I emphatically dissent.

There is no need to rehearse in great detail the basic principles of law that govern the issue before us. As the majority points out, after a trial is over, there is a great judicial "[r]eluctance to

inquire into the state of mind of any juror[s] . . . during their deliberations," and that reluctance rests upon "sound reasons." But reluctance to inquire is not the same as obdurate refusal to face facts, especially such "objective" facts as a rambling, unsolicited letter, sent 13 days after verdict, that strongly suggests severe mental illness. A close look at that letter and the comments upon it of the seven doctors, whose six letters and one affidavit were submitted to the district judge is instructive.

The letter from juror Rush was written on stationery which bears the Zodiac sign "Libra" at the top over a picture of a woman holding scales. It stated as follows:

February 8th—1973

Dear Mr. Dioguardi,

Under the situation and such circumstance I hope that I have made the right decision. I talk to may friends Bertha and her husband Olive about this, Olive agree that I write to you. Bertha, however, was against it. Nevertheless, I felt I had to write you. I cannot omit what I have seen. When I saw the good within you and how hard your wife was trying; I prayed about it. One word appear before me *repent*. If you repent and run a clean business it is the good within you that will save you, and you will gain what you have lost. Before I continue I must explain something to you. I have eyes and ears that I can see things before it happen. I can tell you about other and what they are thinking and doing. If I am wrong about this it is the first time.

I would like to visit you. I would like to do so when my eyes fully open. I would like to talk to you about what appear before me. They are only partly open. I don't know at the present when they will open. Unfortunate, a curse was put upon them some years ago. I have some people working on them. Everything is being done that can be done. So we will have to wait. As I stated I cannot omit what appear before me, when I was on the jury bench. You feel that this is the end for you. However, it is not. Something appear before me that I must do. It is the good within you that I must use and within that good, you will gain what you have lost. If, however, I am wrong it is the first time.

Why, you let such a relationship exist between you and a man like Hellerman? When I think of the good that I saw within you it does not add up. Where did Hellerman get those fur coats? Does he have any for sail? Omit the question. I really can't afford one, and if I could I probably be afraid to wear it.

Why persecute your wife? Your mistake your guilty then take it out on her. The ordeal you put her through I wonder how she survive through it. One word appear before me brave. She is a brave girl. She love you. She never stop loving you not a single moment. Tell her to please be careful. From what I can see she is still in business. I suggest it is not wise at this time. I believe she is being watch.

That was a good lawyer you had. I entain to send him some custom as soon as my eyes open.

Tell Ostrer I am praying for him.

*Mr. Dioguardi*, I want to ask a favor of you please.

I want you to look upon me as a woman and I look upon you as a man and not white man and black woman. Olive agree with me.

Let's leave color out, *OK*.

I was told you will only have to serve one third of the time given. So relax this is not the end. Soon you will be free.

When I call the Federal information center and the record room yesterday they all know you. They all seem to

have it in for you. Its seated deep within them like a personal matter.

Sincerely,

Genena

Thus, the juror claims that she has "eyes and ears that . . . can see things before it happen." She can "tell" what other people "are thinking and doing." Her eyes are now "only partly open" because "a curse was put upon them some years ago." She is writing this letter because "[s]omething appear before me that I must do." Although Dioguardi's wife was never in the courtroom, the juror somehow knows that Mrs. Dioguardi "is a brave girl" and "is still in business," but is being watched. As soon as the juror's "eyes open" she intends to send Dioguardi's lawyer some customers. And when she "saw the good within" Dioguardi and how hard his wife "was trying," the word *"repent"* appeared before her.

The letter is staggering in its implications. No special training is needed to appreciate that this juror seems to believe she is clairvoyant and can see things that may not, or could not, be apparent to others, such as what people think or an event before it happens. And if juror Rush actually did believe she was clairvoyant in this way, is it really necessary to spell out why she could not fairly try the guilt or innocence of any man? It seems obvious to me that a "clairvoyant" juror might honestly "see" a defendant's guilt despite the lack of evidence because she can see into the defendant's mind. Or conversely, she might for the same reason divine a defendant's innocence, in the face of overwhelming proof of guilt. A person who was known to regard herself as clairvoyant would certainly not be allowed on a jury in the first place. United States v. Silverman, 449 F.2d 1341, 1344 (2d Cir. 1971), cert. denied, 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972); United States v. Benson, 31 F. 896, 900 (D.Cal.1887). Such a woman would clearly be "incapable, by reason of mental . . . infirmity, to render satisfactory jury service . . . " under 28 U.S.C. § 1865(b)(4). Cf. Jorgensen v. York Ice & Machinery Corp., 160 F.2d 432, 435 (2d Cir.), cert. denied, 332 U.S. 764, 68 S.Ct. 69, 92 L. Ed. 349 (1947). Moreover, the incapacity on such a ground of even one juror would poison the verdict regardless of the competence of the remaining 11. Parker v. Gladden, 385 U.S. 363, 366, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (per curiam); United States v. Rattenni, 480 F.2d 195, 198 (2d Cir. 1973).

The ultimate question, of course, is whether juror Rush was in fact "incapable" of rendering satisfactory jury service, but the precise legal issue before us is whether enough was presented to the district judge to require holding a hearing to determine her capacity to serve. The district court had before it the juror's letter and the views of seven reputable psychiatrists, all of whom rendered expert opinions that the writer of the letter suffered from severe mental illness.[1] According to some of these doctors, the precise diagnosis of her problem would require clinical evaluation through interviews and tests, but all of the phychiatrists agreed on the existence of a seriously disabling thought disorder which in their opinion would have impaired her mental functioning during the trial and her ability to judge the case intelligently. These expert views stand uncontradicted on the record before us. True, the majority opinion refers to them as "essentially horseback uninformed." However, in view of the district judge's oral order, that no one was to contact the juror,[2] these adjectives are simply not justified. Several of the psychiatrists made clear that they would like to know more about

---

1. The credentials of the seven psychiatrists were set forth in varying detail, but, on this record, all appear to be qualified to give an expert opinion.

2. The judge stated in open court that juror Rush is not to be contacted by anybody or communicated with by anybody in any possible way, directly or indirectly. Is that clear, gentlemen?

the juror. Obviously, the directive prevented defense counsel from attempting any interview, and both defense and government counsel apparently interpreted the order as inhibiting any investigation of the juror, even apart from talking to her.

The combined effect of the uncontradicted record and the apparently intended scope of the judge's order requires a remand for a further hearing. The unsolicited letter is bizarre, and seven psychiatrists have given their opinion on the basis of it that the juror ·was seriously mentally ill during the trial. I do not see how the district court, or we, can disregard these facts. Certainly a defendant is entitled to 12 sane jurors, Parker v. Gladden, *supra*, 385 U.S. at 366, 87 S.Ct. 468, 17 L.Ed.2d 420; United States v. Rattenni, *supra*, 480 F.2d at 198, and if one is incompetent, we should exercise our supervisory power to order a hearing or a new trial just as we would if one turned out to be blind or deaf although no one had noticed it. Possibly this juror is not incompetent; she may just be peculiar. But the record as it now stands cannot justify such a conclusion. It may be that after the record is amplified—at least by cross-examination of appellants' witnesses and by testimony of government experts—the district court might be warranted in finding juror Rush to have been capable of jury service. I express no view as to that. However, at the very least, defendants are entitled to a full hearing on the issue of the juror's competence.

The majority cites a good deal of authority for the proposition that unless there is "substantial if not wholly conclusive evidence" of a juror's incompetence during trial, a post-trial inquiry will not be ordered "merely on the allegations and opinions of a losing party." See, e. g., Peterman v. Indian Motorcycle Co., 216 F.2d 289 (1st Cir. .1954). I do not quarrel with this statement of the

law. Indeed, I heartily endorse it since the evidence on this record of the mental incompetence of juror Rush is, as I have indicated, quite "substantial." Moreover, the inquiry here was not triggered solely by "the allegations and opinions of a losing party," but by the unsolicited letter of the juror herself, which was sent only 13 days after the verdict and is itself persuasive evidence of incapacity.[3] None of the decisions cited by the majority involved such an unusual objective fact. In *Peterman, supra,* for example, there was no communication by the juror, which was itself an overt symptom of mental disorder. On the contrary, there was "no suggestion that the juror was insane," 216 F.2d at 293, whereas here the uncontradicted record supports the opposite conclusion. Furthermore, in many cases of alleged juror taint, hearings were actually held or ordered upon remand. See, e. g., Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); United States v. Hand, 472 F.2d 162 (5th Cir. 1973) (per curiam); United States v. Silverman, supra; United States ex rel. Owen v. McMann, 435 F.2d 813 (2d Cir. 1970), cert. denied, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971). Cf. Smith v. Cox, 435 F.2d 453 (4th Cir. 1970), vacated on other grounds sub nom. Slayton v. Smith, 404 U.S. 53, 92 S.Ct. 174, 30 L.Ed.2d 209 (1971).

I would only add the observation that, far from loosing a Pandora's box of challenges to jury verdicts (as the district court feared), a remand for a hearing here would have almost no precedential value because of the uniqueness of the facts. Nor would a hearing under these circumstances raise the twin spectres of juror harassment or incursion on jurors' privacy during their deliberations. Cf. Miller v. United States, 403 F.2d 77, 82 (2d Cir. 1968). The letter which forms the basis of the present attack on the verdict below was, as I have stressed, unasked for, and not the product of a fishing expedition. More-

---

3. There is no hint in the record that the letter was actually solicited or not genuine.

Upon remand, those questions could, of course, be explored.

over, an inquiry into competence need not entail a probe of jury discussions. I have already mentioned such alternative possibilities of enlarging the record as cross-examination of appellants' witnesses and testimony by government experts. Counsel may also develop evidence by investigating the juror's background or by persuading her to undergo a voluntary mental examination. I see no need to explore every conceivable avenue of investigation, but merely wish to make the point that I am not counseling any general break with the wise policy of protecting the sanctity of the jury room and the privacy of individual jurors.

For these reasons, I strongly believe that the district court erred in refusing to make further inquiry into the competence of juror Rush. Therefore, I dissent from the affirmance of the order denying a new trial without a hearing.[4]

---

4. I agree with the majority's disposition of the other points raised by appellants.